PITTSBURGH REDUCTION CO. v. COWLES ELECTRIC SMELTING
& ALUMINUM CO.

(Circuit Court, N. D. Ohio, E. D.  January 20, 1893.)

No. 4,869.

1. PATENTS FOR INVENTIONS—ANTICIPATION—ALUMINUM BY ELECTROLYSIS.
Letters patent No. 400,766, granted April 2, 1889, to Charles M. Hall, for an improved process of reducing aluminum by electrolysis, which process consists in dissolving alumina in a fused bath of the fluorides of aluminum and of some metal more electro-positive than aluminum, and then passing an electric current through the fused mass, whereby the aluminum of the alumina is precipitated at the cathode and its oxygen liberated at the anode; the bath meanwhile being unaffected as to its chemical composition.  One De Ville, in a work on aluminum, published in 1859, described a process of coating copper with aluminum, in which the bath is the double chloride of aluminum and sodium, the cathode a bar of copper, and the anode a bar of aluminum.  When the current is passed through the bath the chloride of aluminum is decomposed, the aluminum is deposited on the copper, and the chlorine gas, freed at the anode, attacks the bar of aluminum, and forms the chloride again, thus keeping the bath constant.  *Held*, this was clearly no anticipation of Hall's patent.

2. SAME.
De Ville described a modification of this process, in which the bath is cryolite,—a double fluoride of aluminum and sodium,—and the anode a compact mixture of carbon and alumina, which, upon the passage of the current, gives the following reaction:  The fluoride of aluminum is decomposed, its aluminum precipitated at the cathode and the fluorine at the anode, where it combines with the aluminum of the alumina, to form again the fluoride, and sets free its oxygen, which combines with the carbon to form carbonic oxide.  *Held*, that this is not an anticipation of the Hall patent, inasmuch as the electrolyte is not dissolved alumina, as in the patent, but is the fluoride of aluminum,—one component of the bath itself: and the bath does not remain constant, but requires continuous renewal by the electro-chemical solution of the alumina of the anode.

3. SAME.
Even though the alumina from the anode in the De Ville process was dissolved in the bath and electrolyzed, he made no note of the fact, and it must be deemed an accident, which he failed to observe, and therefore it would not constitute any anticipation of the patented process.

4. SAME.
In order to show that the Hall process was identical with that of De Ville, the theory was advanced that in the former the electrolyte is not the dissolved alumina, but the fluoride of aluminum of the bath; and that, when this fluoride is decomposed, the fluorine attacks the dissolved alumina, drives off the oxygen to the anode, and unites with the aluminum remaining, thus restoring the bath.  *Held* that, even if this were true, the Hall process would still be patentable for the regeneration of the bath accomplished by it is complete, and free from the escape of the corrosive fluorine gas, which renders the De Ville process a failure for commercial purposes.

5. SAME.
This theory of the reactions in the Hall process is, however, shown to to be invalid by the facts that the alumina dissolves without any evidence of chemical action; that the action of the current gives no evidence of other products of decomposition than aluminum and oxygen; and that, as soon as the alumina is exhausted, the resistance to the current is doubled, indicating that the electrolyte has been changed; and, moreover, the theory contains a contradiction, in assuming, on the one hand, that the dissolved alumina will be decomposed by the fluoride of aluminum, and,

on the other, that the alumina is a more stable compound when electrolysis ensues so that the fluoride becomes the electrolyte.

**6. SAME—"OXYFLUORIDE OF ALUMINUM."**

The theory that when the alumina is dissolved in the bath in Hall's process there is found "an oxyfluoride of aluminum," which becomes the electrolyte, cannot avail to affect the validity of the patent, for it does not appear that any chemist has ever isolated any such compound, or known that it exists.

**7. SAME.**

Hall's claim to be the discoverer of the fact that cryolite will freely dissolve alumina to the extent of 10 to 25 per cent. of its own weight is not prejudiced by the fact that it had been used to wash off the film of alumina adhering to the globules of aluminum produced by De Ville's chemical process, for it appears that it was so used only as a substitute for fluoride of sodium or fluoride of calcium, either of which will dissolve no more than 1 per cent. of its own weight of alumina.

**8. SAME.**

Knowledge of this solubility of alumina in cryolite is not shown by the fact that in several English patents issued for the De Ville electrolytic process the anode of carbon and alumina is described as "soluble," for the anode of pure aluminum is likewise called "soluble," and the term is indicative only of the action of the fluorine gas in attacking the aluminum of the anode and forming the fluoride.

**9. SAME.**

A French patent was granted to one Fuerst August 8, 1884, for an electrolytic process of producing aluminum from alkaline aluminates in solution or fusion, alumina being added to regenerate the bath. The process, as described by him, was admitted to be inoperative; but he mentioned as one of the "indifferent or auxiliary bodies" that might be present in his hypothetical electrolyte, hydrofluoric acid; and it was shown by experiment that, if there be added to aluminate of soda eight times its weight of hydrofluoric acid, there would result a double fluoride of aluminum and sodium, which, upon the addition of alumina, and the passage of the current, would give the Hall process exactly. *Held*, that this experiment cannot avail to show an anticipation by Fuerst, for his mention of hydrofluoric acid as an "indifferent or auxiliary body" will not cover its use in excess, as herein; and, moreover, the experiment violates his express injunction that these foreign bodies, whatever they may be, shall not produce decomposition of the aluminates employed.

**10. SAME—PROCESS—IMPROVEMENTS IN METHOD.**

The means described in Hall's patent for effecting the process covered by it included the fusion of the bath by external heat before the current was passed through it to decompose the alumina, and a plant was constructed and successfully operated upon this method. It was subsequently discovered that the resistance of the components of the bath to a current sufficiently strong to accomplish electrolysis produced heat enough to maintain the fusion without the aid of external heat, a possibility suggested by Hall in his first specifications. *Held* that, even though the use of internal heat as a means of fusing the bath and carrying out the process might be such an improvement on the use of external heat as to render business competition between the two methods impossible, nevertheless the process was the same, and, as the method with external heat did accomplish a useful result, Hall, as the patentee, was entitled to the exclusive right of his process, whatever were the subsequent improvements on his method or apparatus for carrying it out.

**11. SAME—ELEMENT OF CLAIM—ABANDONMENT.**

Hall used a carbon anode in his experiments before applying for a patent, but in his application he stated that there were certain disadvantages incident to its' use, and it was not embodied in his amended claims until more than two years thereafter, when it had been included in the claims of a pending application for a patent for the same process, which was refused upon an interference with Hall's patent. *Held*, that

this did not amount to an abandonment to the public of the carbon anode.

12. SAME—SPECIFICATION—DISCLAIMER.

The Hall patent claimed a bath "composed of the fluorides of aluminum and a metal more electro-positive than aluminum." In his specification he described a bath composed of fluorides of aluminum and sodium, "these salts being preferably mingled together in the proportions of 84 parts of sodium fluoride and 169 parts of aluminum fluoride. A convenient method of forming the bath consists in adding to the mineral cryolite 338-421 of its weight of aluminum fluoride to secure in the bath the proper relative proportions of the fluorides. Such proportions may be varied within certain limits without materially affecting the operation or function of the bath, as, in fact, any proportions which may be found suitable may be employed." Held, that this could not be construed as a disclaimer of the use of cryolite alone (which is a double fluoride of aluminum and sodium) for the bath, and that the patent covers every double fluoride of aluminum and sodium which can be made to produce aluminum when used as a bath in the Hall process.

13. SAME—LIMITING CLAIMS.

The facts that Hall in his specifications describes an apparatus for fusing the bath by external heat, and that the claim speaks of dissolving alumina in the fused bath, "and then passing an electric current," do not limit him to the use of external heat as against the heat developed by the current itself, for the claims contain nothing as to the production of the heat, and the patent states that the apparatus described therein forms no part of the invention. Following Tilghman v. Proctor, 102 U. S. 707.

14. SAME—CONSTRUCTION OF CLAIM.

The claim in the Hall patent of a "carbonaceous anode" covers both anodes made partly of carbon and those composed wholly of that substance.

In Equity. Bill to restrain infringement of patent. Decree for complainant.

George H. Christy and W. Bakewell & Sons, for complainant.

Henry S. Sherman, Leggett & Leggett, and Frederick S. Betts, for defendant.

Before TAFT, Circuit Judge, and RICKS, District Judge.

TAFT, Circuit Judge. This is a suit in equity by the Pittsburgh Reduction Company against the Cowles Electric Smelting & Aluminum Company, to restrain the infringement of a patent process for reducing aluminum by electrolysis, (letters patent No. 400,766,) owned by the complainant under an assignment from the original patentee, Charles M. Hall. The patent was applied for July 9, 1886, and was granted April 2, 1889. The defenses to the suit are: First, that the patent is invalid for want of novelty; and, second, that the defendant does not infringe.

Electrolysis is a process for separating a chemical compound into its elements by passing through it an electric current. The current is effective for this purpose only when the compound is reduced to a liquid state, either by solution or fusion. The compound which is decomposed by the current is called the "electrolyte."

Aluminum is a metal which was first isolated by Wohler in 1827. There is great difficulty in obtaining the pure metal from its compounds because of the tenacity with which it unites with other

substances. The compounds of aluminum are very abundant in nature. The most common, perhaps, is the oxide of aluminum, called alumina, one molecule of which is composed of three atoms of oxygen and two atoms of aluminum. Alumina is insoluble in water, and practically infusible.

Fluorine unites with the metals to form fluorides. The fluoride of sodium and the fluoride of aluminum united form what is known as the "double fluoride of aluminum and sodium." There are·several minerals found in nature which are double fluorides of aluminum and sodium, of which cryolite is much more common than the others, and is found in large quantities in Greenland. Its uses are so extensive that it has become a well-known article of commerce.

More than 50 metals are known to chemists. When one of these is united with nonmetallic substances, and the compound is reduced to a liquid state by solution or fusion, and subjected to an electric current, which decomposes it, the nonmetallic element of the compound will be drawn by the current to that point in the bath where the current enters it from the positive pole, called the "anode," and the metal will move in the direction of the point where the current leaves the bath for the negative pole, called the "cathode." Metals differ, however, in the ease with which the current can draw them to the cathode; and when one is more sluggish than another in yielding to this influence the one is said to be more electro-positive than the other. Scientists have arranged all known metals accordingly. The only metals more electro-positive than aluminum are magnesium, calcium, strontium, barium, lithium, sodium, potassium, rubidium, and caesium. All other metals yield more readily to the current. When several compounds in solution or fusion are electrolyzed, the current will attack and decompose that compound whose parts are least firmly united, or, as the phrase is, "which is least stable." As might be supposed from the foregoing, the more electro-positive a metal is, the more stable its compounds are likely to be. Alumina is so common in nature that every one, in a desire to get pure aluminum, would naturally turn to that as one of the simplest of its compounds; but the fact that the oxygen has proved to be so firmly united to aluminum as to resist the action of the highest heat has been very discouraging to chemists.

Hall, the original patentee of the patent in suit, was a resident of Oberlin, Ohio, and a graduate of the college at that place. He had a strong taste for chemistry, and after leaving college in 1884 gave his attention, among other things, to the aluminum problem, which had baffled so many before him. He conceived the idea of obtaining aluminum from alumina by electrolysis, and concluded that if he could find a bath made up of compounds more electrically stable than alumina, which would freely dissolve alumina, the application of the current to the mixture would precipitate the aluminum upon the cathode, and would free the oxygen at the anode. He discovered that the fluoride of aluminum, when united with the fluoride of any metal more electro-positive than aluminum, to form a double fluoride, would, when heated to fusion, dissolve alumina as freely as

sugar will dissolve in water, and that an electric current passed through the fused mixture would deposit pure aluminum at the poles. Hall took out one patent for the process, in which he used a double fluoride of sodium and aluminum, and in this patent he also claimed the general process broadly, as we have stated it above. This is the patent in suit. He also took out other patents, as permitted by the practice of the patent office, covering the process when the fluorides of other metals more electro-positive than aluminum are used. The two claims of the patent in suit which are here involved are as follows:

"(1) As an improvement in the art of manufacturing aluminum, the herein described process, which consists in dissolving alumina in a fused bath composed of the fluorides of aluminum, and a metal more electro-positive than aluminum, and then passing an electric current through the fused mass, substantially as set forth.

"(2) As an improvement in the art of manufacturing aluminum, the herein-described process, which consists in dissolving alumina in a fused bath composed of the fluorides of aluminum and sodium, and then passing an electric current, by means of a carbonaceous anode, through the fused mass, substantially as set forth."

The defendant is said to infringe both these claims. The validity of the first, so far as it covers defendant's process, and of the second, is attacked by the defendant.

We shall first consider the validity of the claims, and in that connection must refer to the history of the art. It is said on behalf of the defendant that as far back as 1859, De Ville, a famous French chemist, published to the world the process which Hall has included in his patent. De Ville gave a great deal of time to aluminum and its production from its compounds. He was the discoverer of the purely chemical process by which, without the aid of electricity, pure aluminum has been manufactured since his day down to the present time. He also gave some attention to the manufacture of aluminum by the process of electrolysis. In the publication by De Ville on aluminum, its properties, its manufacture, and its uses, in the year 1859, we find this statement:

"Aluminum by the Current. The same bath of the double chloride of aluminum and sodium can be used for coating with aluminum, especially copper, on which Captain Caron and myself have worked. In order to succeed well, one must employ a bath of the double chloride, which has been carefully purified from all metallic substances by the action of the current itself. When the aluminum which deposits at the negative pole appears pure, one attaches to this pole the piece of copper to be aluminized, and to the negative pole a bar of aluminum."

("Footnote. A compact mixture of carbon and alumina, which is transferred into chloride of aluminum gradually and in measure as the deposit of aluminum takes place, keeps the composition of the bath constant for an indefinite period of time.")

"The temperature must be kept somewhat below the melting point of aluminum. The deposit takes place with great facility. It is very adhering; but it is difficult to prevent the metal from getting impregnated with double chloride, which attacks it the moment one washes the piece, while, with some precaution, one succeeds. The washing of the piece must be done with much water, and for a long time. Cryolite, in the same way can be used in this operation, but it must be made more fusible by mixing it with a little double chloride of sodium and aluminum, and with potassium chloride."

The process here described is not for producing pure aluminum, but for plating aluminum on copper. It will be seen that the bath which is first and chiefly recommended by De Ville is not a fluoride of aluminum and sodium, but a double chloride of aluminum and sodium, i. e. a double compound of chlorine with each of these metals. Alumina will not dissolve in a double chloride of aluminum and sodium, heated to a fused state. The operation of the process first described by De Ville is this: The double chloride of aluminum and sodium is heated to a state of fusion. The piece of copper is made the cathode, and a bar of aluminum is made the anode. When the current is passed through the bath, the chloride of aluminum, being the less stable compound, is dissolved into its elements. The aluminum is deposited on the copper, and the chlorine gas is freed at the positive pole, where it attacks the anode of aluminum, and its atoms unite chemically with atoms of the aluminum, to reform again molecules of aluminum chloride, which, when formed, take their place in the bath. The bath, which was partially destroyed by the disruption of the chloride of aluminum, is thus restored, to be again electrolyzed. Instead of the anode of aluminum, the footnote suggests that the compact mixture of carbon and alumina may be substituted for the bar of aluminum as an anode, and that the escaping chlorine gas, being presented to the compact mixture of carbon and alumina, would unite with the aluminum of the alumina, while the oxygen of the alumina would unite with the carbon, and pass off as carbonic oxide gas. The chlorine gas and aluminum would make chloride of aluminum, and, being reintroduced into the bath, would keep it constant.

Finally, it will be observed that De Ville suggests that instead of the double chlorides of aluminum and sodium, cryolite may be used, but that it must be made more fusible by mixing it with a little double chloride of sodium and aluminum and with potassium chloride; and it is the proposition of De Ville to use cryolite in this way as the main part of the bath, and an anode of carbon and alumina in accordance with the footnote, which the defendant's counsel and experts contend is substantially the same process as that on which Hall claims a patent.

Cryolite, as we have seen, is a double fluoride of aluminum and sodium. The theory of the process of De Ville is that the electric current disrupts the fluoride of aluminum which is a less stable compound than the fluoride of sodium. Fluorine gas is liberated at the anode, and, being presented to the mixture of carbon and alumina, unites with the aluminum, and leaves the oxygen with the carbon to make carbonic oxide gas. The fluoride of aluminum thus constituted at the anode renews the bath, and is supposed to keep it constant; while the aluminum of the original fluoride of aluminum, which was in the bath, is deposited at the negative pole.

We are very clear in our opinion that this is not an anticipation of Hall's patent. The primary and most important step of Hall's patent is the dissolving of the alumina in the fused bath of the double fluoride of aluminum and sodium. This happens before any electrolysis occurs at all. When the electric current is ap-

plied, it disrupts the alumina, sending the aluminum to the cathode and the oxygen to the anode, where it unites with the carbon anode, and becomes carbonic oxide gas. The bath material in which the alumina was dissolved—that is, the double fluoride of aluminum and sodium—is not affected by the electric current, and the process is made continuous by the simple addition of alumina to the bath. In the De Ville process, however, alumina is not dissolved in the bath. The fused mass subjected to the current is composed of a double fluoride of aluminum and sodium with no alumina in it. No effect comes from the presence of the alumina in the anode until after the electric current is passed through, and the fluoride of aluminum has been disrupted, and fluorine gas has been produced at the anode; then the gas unites with the aluminum of the alumina, and restores the bath, in a manner, to its former state, to be again disrupted by the application of the current. In the one case there is a simple solution of the alumina in a bath and its disruption by the current, the bath remaining constant; while in the De Ville process the bath itself is disrupted, and restored again by the union of one of the disrupted elements with an element of the alumina in the compact anode. In the Hall process there is simply solution of the alumina and electrolysis; in the De Ville process there was electrolysis, followed by what is called an "electro-chemical solution of the alumina."

Defendant's counsel and experts, in their effort to make the two processes the same, rely upon the supposition that when the compact anode of carbon and alumina was inserted by De Ville into the bath of cryolite some of the alumina was necessarily dissolved in the cryolite, and so the current electrolyzed that alumina as in the Hall process. In the first place, the experiments made on behalf of complainant demonstrate that a compact mixture of carbon and alumina (which can only be made by the use of some binding material) may be kept in a bath of cryolite for many hours without dissolving the alumina at all. Some counter experiments by defendant are by no means so satisfactory, because the results may be attributed to the presence of other causes than the solution of the compact anode.

But suppose it to be a fact that in De Ville's process alumina was dissolved in the bath from the anode, and that thereupon it was electrolyzed as in the Hall process, it was a mere accident, of which De Ville made no note, and which, therefore, we may reasonably infer, he did not observe. Accidents of this character cannot be relied on as anticipations of a patented process (Tilghman v. Proctor, 102 U. S. 707, 711) when the operator does not recognize the means by which the accidental result is accomplished, and does not thereafter consciously and purposely adopt such means as a process for reaching the result. De Ville did not intend that the alumina should be dissolved in the bath. If he did, why did he unite it with carbon by means of pressure and a binding material? If he had intended to dissolve the alumina, he could not have done anything which would have so interfered with his purpose. Just as Prof. Langley says, such a course would have been as reasonable

as it would be for a man, wishing to dissolve a lump of sugar in his coffee, to varnish it or grease it. De Ville did not intend to dissolve the alumina in the bath—First, because, as we shall see hereafter, he had no knowledge that it would dissolve therein; and, second, because, until the fluoride of aluminum had been decomposed in the bath by the current, he did not need anything with which to restore that fluoride to the bath. He felt that it was necessary to have the alumina in a solid form, in close connection with the carbon, because, without the strong attraction that the carbon would have for the oxygen of the alumina, the fluorine gas could not get at the aluminum of the oxide.

De Ville was seeking to electrolyze the fluoride of aluminum, while Hall was seeking to electrolyze alumina. It was a condition precedent to Hall's success that his alumina should be in a liquid state. As we have seen, it was essential to De Ville's process that his alumina should be where it was, i. e. mixed in solid form with the carbon.

This brings us to a theory of the Hall process which has been advanced by one or more of the defendant's experts to show that the Hall and De Ville processes are alike. Hall says in effect, in the specifications for his patent, that the electrolyte in his process is the alumina held in solution, and that in the decomposition the aluminum of the alumina goes to the cathode and the oxygen of the alumina goes to the anode, the fused double fluoride constituting the bath remaining unaffected. The theory, or, we would better say, the alternative theory, of the defendant's experts (for they venture more than one) is that the fluoride of aluminum is the electrolyte, and that when it is decomposed the fluorine attacks the dissolved alumina, drives off the oxygen to the anode, and unites with the aluminum remaining, thus restoring or regenerating the bath. This theory is advanced for the purpose of showing that the Hall bath does not remain constant, as he claims, but has to be regenerated as in the De Ville process, the only difference being that in the former the alumina is held in the bath in solution, while in the latter it is held in a compact mixture of carbon and alumina. If this were the only difference between the two processes, we should hold that the Hall process was a patentable discovery, because the regeneration of the bath from the dissolved alumina, if such were the chemical action which took place, would be a successful process, because regeneration is so complete as not even to betray itself, while in the practical operation of the De Ville process the regeneration of the bath is very incomplete. The fluorine gas escapes into the air, and is so corrosive as to injure both workmen and apparatus, and the process is a failure for commercial purposes. The compact mixture of carbon and alumina is hard to make, and obstructs regeneration; and the substitution for it of dissolved alumina, even if their functions in the process are exactly the same, is the step from failure to success.

But there is no satisfactory evidence at all that the dissolved alumina is not the electrolyte, and the burden is on the defendant to show it. Coffin v. Ogden, 18 Wall. 120, 124. Prof. Chandler,

of the Columbia School of Mines, called as an expert witness for the complainant, demonstrates, so far as chemical actions and reactions are capable of demonstration, that it is the alumina which is decomposed by the current. He says that the alumina dissolves in the fused bath of cryolite, as sugar does in water, quietly, without any of the usual evidences of chemical action, such as the production of heat, or the reduction of fusibility or thickening of the liquid. This seems to show that the alumina in solution remains chemically unchanged. He refers to the fact, admitted on all hands, that when the current is applied, aluminum goes to the cathode and oxygen to the anode without any indication of any other product of decomposition. This result is fully satisfied by the explanation that the alumina alone is decomposed. He refers to another fact, also admitted, that, as soon as the alumina in the bath is exhausted, the resistance to the current and the voltage of the current to overcome it become doubled, and are not reduced until alumina is added to the bath. This would seem to show that the electrolyte has been changed by the exhaustion of the alumina, and therefore that, when present, alumina is the electrolyte. The professor further shows from the observations of the most reliable chemists that the heats of formation of the three compounds in the bath are such that it would require 4.8 volts to decompose sodium fluoride, 4 volts to decompose aluminum fluoride, and 2.8 volts to decompose alumina, which proves that the alumina would first yield to the action of the current, and in the presence of the other two compounds would be the electrolyte. More than this, Prof. Chandler points out a fatal contradiction in the theory that the fluoride of aluminum is the electrolyte in the Hall bath. That theory assumes on the one hand that the dissolved alumina will be decomposed by the fluoride of aluminum, and on the other that the alumina is a more stable compound than the fluoride when electrolysis ensues, so that the fluoride, and not the alumina, becomes the electrolyte. Finally, the theory is shown to be unfounded by the total absence at the anode of fluorine gas, which would certainly be there present in perceptible quantities if fluoride of aluminum is the electrolyte and fluorine is released by the current. No facts of any kind are advanced by the defendant's experts to meet this demonstration of Prof. Chandler, which is fully concurred in by Prof. Langley of the Case School of Applied Sciences, and Dr. Raymond. The arguments, such as they are, depend on analogies drawn from the electrolysis of entirely different compounds, as, for instance, water. With the burden on the defendant on this issue, we are very clear that it has not been sustained.

An alternative theory, advanced by some of defendant's experts, is that when alumina is dissolved in the bath, a compound of oxygen, fluorine, and aluminum, called "oxyfluoride of aluminum," is formed, which is the electrotype. It is sufficient to say of this theory that no chemist, and certainly none of defendant's experts, ever isolated such a compound, and no one knows that it exists. The reason for its theoretical existence is that such a compound is formed with the chlorides. Analogies between the fluorides

and the chlorides constantly fail. In this very case we find that the former will dissolve alumina, and the latter will not. The oxyfluoride of aluminum theory is mere speculation, and not worthy of consideration in a case involving property rights.

The defendant company instituted a number of experiments to show that the De Ville process would work as well and in much the same way as the Hall process. The evidence concerning these experiments, although it all comes from the defendant's witnesses, leaves no doubt in our minds that they were not conducted in a fair spirit, but rather with an intense desire to force a demonstration of the identity of the De Ville and the Hall processes. Nothing else can explain the palpable disobedience to De Ville's express directions for carrying out his process. According to De Ville's directions, the bath must not be heated up to the melting point of aluminum. This is evident, because his main process contemplates an aluminum anode, and heat beyond its melting point would destroy it as an anode, and it is for this reason that he directs that the fusibility of cryolite be reduced by mixing it with chlorides. In the experiments of the defendant the bath was heated far beyond the melting point of aluminum. It was so hot that the carbon of the carbon-alumina anode, a large part of which was not sunk in the bath, but was exposed to the air, united with the oxygen of the air, and was burned out. This left on the exterior of the anode nothing but a ring of pure alumina, which, dropping into the bath, was of course dissolved as in the Hall process, and from it aluminum was deposited at the cathode. Then, too, stubs of the partly used carbon-alumina anodes were ground up and thrown into the bath of cryolite, and of course the particles of alumina, separated by the grinding process from the carbon, became dissolved in the bath, and the Hall process was again reproduced. De Ville did not contemplate the presence of alumina in the bath except in a compact mixture with carbon, and yet the experiments of defendant presented alumina to the bath wholly free from carbon. Even with these approaches to the Hall process, the cost of producing the aluminum which was produced exceeded that of the Hall process some sixfold. Nothing could more clearly demonstrate the difference between the De Ville and the Hall processes.

We have considered the Hall process as a whole, and thus compared it with the De Ville bath-regenerating process. A comparison of his process with De Ville's and the difference would not be complete, however, without some reference to Hall's claim that he was the first discoverer of the fact that alumina would freely dissolve in the fused double fluoride of aluminum and sodium. The fact is that such a bath will dissolve from 10 to 25 per cent. of its weight as completely as water will sugar. Defendant claims that this was well known in the art long before Hall's application. The first publication relied on to establish the claim is found in one of De Ville's works, as follows:

"Cryolite is a double fluoride of aluminum and sodium, which one may produce artificially or imitate by mixing hydrofluoric acid in excess in pure and

calcined alumina and carbonate of sodium in quantities such that the sodium and aluminum will be present in the proportions in which they exist in cryolite. After drying and fusing the mixture one has a limpid and homogeneous substance which possesses all the exterior characteristics of fused cryolite. I have not yet made an analysis of it, but the weight of the substance produced is such that one must suppose that the alumina and soda have lost all their oxygen by transformation into fluoride. This cryolite, like the natural cryolite, gives aluminum when reduced by soda. It also yields aluminum under the influence of an electric current, which a mixture of alumina and fluoride of sodium fused together will not do. When this experiment is made, one perceives that the alumina dissolves in the fluoride, but in small quantity, and remains in the condition of alumina, because an electric current, which passes through the well-fused substance, yields sodium and fluorine. These experiments, which succeed very well when one employs a mixture of fluoride of sodium and fluoride of potassium, prove further that alumina at red heat is decomposed neither by sodium nor by potassium."

There is no statement here at all that cryolite will dissolve alumina. The words, "when this experiment is made," etc., clearly refer to the experiment last spoken of; that is, to passing an electric current through a mixture of alumina and fluoride of sodium fused together. In such an experiment De Ville says that the alumina dissolves in the fluoride, i. e. the fluoride of sodium, in small quantity. There was no cryolite in this experiment.

All the other publications relied on relate to a feature of the purely chemical process which De Ville discovered for the reduction of pure aluminum by the use of sodium. In that process the aluminum appears in tiny granules or globules of the pure metal, which De Ville found much difficulty in running together to make a button. He attributed this difficulty to the presence of a thin film of alumina surrounding each globule, formed by a union of the aluminum with the oxygen of the moisture developed in the experiment. He found that this film could be removed by washing the globules with fluoride of sodium. De Ville says:

"The facility with which aluminum gathers together in the fluorides is due without doubt to the property which they possess of dissolving the alumina which the moisture adhering to the chloride of aluminum deposits on the surface of the globules on the instant of their formation, and which the sodium is unable to reduce."

De Ville does not here refer to the power which double fluorides have of dissolving alumina, but to the power which the fluorides singly have of doing so. For, as we shall see from a subsequent publication, he used in his experiments the fluoride of sodium. Speaking of the same process, Charles and Alexander Tissier, in a work on aluminum, say:

"This salt [i. e. fluor spar] is without action on aluminum, of which it constitutes one of the best fluxes, especially so because of the property which it has of dissolving the alumina with which the metal may be contaminated, and thus facilitating the reunion of the metallic particles."

In speaking of the chloride of sodium, the same authors say:

"This is the salt which we employ habitually in recasting aluminum. However, it does not possess, like the fluoride, the property of dissolving the alumina."

The fluoride here referred to is, of course, the fluoride of sodium. Again, the same authors say:

312          .FEDERAL REPORTER, vol. 55.

"Such was the state of aluminum manufacture, when, towards the close of 1855, De Ville, surprised by the facility with which the aluminum gathered together when it was reduced from its fluoride instead of reducing it from its chloride, conceived the idea of trying how the fluoride would act under these circumstances. He perceived that the success of the operation was due to the fact that the alumina interposed between the small globules (that is, the small globules of metallic aluminum) was dissolved by the fluoride of sodium which was formed, and thus imparted to the metallic particles a much greater facility of reunion."

Referring to the same operation, Pelouze and Fremy, in a work published in 1865, say:

"It is probable that the salty, pasty state of this slag (i. e. the film about the globules) is due to the alumina which the fluorides dissolve well, but thereby lose their fluidity. This slag is composed principally of common salt and fluoride of aluminum in the following proportions: Common salt, 60 parts; fluoride of aluminum, 40 parts. When this slag is washed, the salt is dissolved, and there is left fluoride of aluminum, and a little cryolite and alumina. This is the alumina which has been dissolved or retained by the fluoride bath."

Again, in a German work by Hoffman, published in 1875, there is this reference to De Ville's process of making aluminum by his purely chemical process:

"Instead of the pure chloride of aluminum, De Ville soon after employed the double fluoride of aluminum and sodium, which he reduced in a reverberatory furnace with sodium. However, the chloride of aluminum and its double salt eagerly attract moisture, and then yield, on heating, hydrochloric acid and alumina, (aluminum oxide.) This last coats over the separately reduced globules of aluminum with a thin skin of oxide, which makes it difficult to get the globules to unite in a mass. This oxide, as Rosseau and Morin found, is dissolved by fluorides. For this reason fluor spar, or, as Pelouze and Fremy recommended, cryolite, is added to the double salt."

Payen, another chemist, in a work published in 1878, refers to the same process, and says:

"Cryolite may always be used with advantage in the place of fluor spar. It acts both as a solvent for alumina, like fluor spar, and also increases the yield by furnishing more aluminum."

We have given all the references relied on by defendant. It is perfectly apparent to us that it was only known that cryolite would wash off the film of what was supposed to be alumina from the tiny globules of aluminum in the De Ville chemical process exactly as fluoride of sodium or fluoride of calcium would, and that cryolite was proposed merely as a substitute for those compounds in this process. But fluoride of calcium will dissolve only 1 per cent. of its own weight in alumina, and fluoride of sodium even less. This does not show that any chemist knew, until Hall discovered it, that cryolite would dissolve alumina as water does sugar. Indeed, it will be noticed that Pelouze and Fremy, who recommended cryolite as a substitute for fluor spar in washing off the alumina film, say that by such dissolving the cryolite will lose its fluidity. Considering the slight amount of alumina to be washed off, this would show conclusively that they did not know or realize that cryolite would freely dissolve alumina, and not lose its fluidity at all. It will not do to say that the difference is only one of degree. If cryolite only dissolved one per cent. of its weight in alumina, Hall's process would

never have been heard of. The difference between what Hall discovered and what was known before him in this regard is the difference between complete knowledge on a subject and so little as to be wholly useless and not to suggest further inquiry. It is impossible, if De Ville had any knowledge that alumina could be dissolved in cryolite, as Hall found, that he should not have made a note of it, for all the experts agree that he observed most carefully, and noted exactly all that he observed.

Another claim in this connection perhaps deserves some notice. In several patents which were taken out in England for the making of aluminum by what is the De Ville process without any variation, the anode, made of a compact mixture of carbon and alumina, is referred to as a "soluble" anode. This is said to show that the patentees knew that alumina would dissolve in the cryolite bath. The expression is used merely to indicate the action of the fluorine gas, released at the anode by the current, in uniting with the aluminum of the alumina in the anode, and regenerating the bath, which of course destroys the anode. It is an electro-chemical solution of the anode, and wholly different from a free solution of alumina in the bath without any aid from electricity. That the term "soluble" has no other meaning in this connection is evident, because an anode of pure aluminum is also called "soluble."

We have read with care every part of this voluminous record of over 1,500 pages, and, while we are not chemists, we have obtained a sufficient understanding of the principles applied in the Hall and De Ville processes to be entirely confident that they are wholly different, and that no skilled chemist and electrician could have developed the Hall process from the De Ville process without a real discovery.

The Bell patent of 1861, the Johnson provisional specifications of 1879, the Johnson specification of 1883, and the Graetzel patent of 1884, which are all recorded in the English patent office, and are produced here by the defendant and relied on as anticipations of Hall's patent, are mere reproductions of the De Ville bath-regenerating process, with various attempts to avoid the difficulties which the process presents in its practical operation. The Graetzel patent—the latest of them—was a failure. This is admitted by the patentee himself, who was a witness in the case. The Johnson specifications were never even proceeded with to the procuring of a patent, and the Bell patent has never been used at all to make aluminum commercially. It is said that one reason why these electrolytic processes, including De Ville's, were not brought into actual use, was that, until within a very few years, there were no dynamos capable of furnishing sufficient electric volume and force to make them practicable for commercial purposes. That the improvements in the machines for producing electricity have greatly facilitated the use of electrolysis as an agent in commercial processes is not to be denied, but the failure of the De Ville process for making aluminum by electrolysis finds a far better reason in the inherent difficulties of the process itself than in the mere expense of electricity. If the De Ville process is operative with the present modes of producing electricity, why does not the defendant adopt it? It is free to any one. The

various futile attempts to relieve the De Ville process of its defects is strong proof that it was and is a failure without regard to the development in the making of electricity.

There are other patents introduced to show anticipation than those which involve the De Ville process, but of these there is only one which, it is seriously contended, discloses the Hall process. This is a French patent of Fuerst, dated August 8, 1884. In this patent the patentee says:

"The process of which I claim the industrial property consists in making the electrolysis of alkaline aluminates, or alkaline earthy aluminates, in the condition of solution or of fusion. For this I take an alkaline aluminate, or earthy alkaline aluminate; that is to say, one of the aluminates of potassium, of sodium, or of barium, etc. Into this body, in solution or fusion, according to the circumstances, I introduce the two poles of an electric current of suitable tension. There is nothing further to do than to receive the aluminum upon the cathodes employed, (negative poles,) where I collect it in order to melt or utilize it alone or in different alloys for all the industrial uses to which it can lend itself. As to the anodes, (positive poles,) these anodes can be, according to my desire, soluble or insoluble, and I reserve to myself the the industrial property of each of these two cases. While I employ anodes which are insoluble, or are considered such industrially, I reserve to myself to maintain a constant composition in these electrolytic baths by adding to them, as is needed, oxide of aluminum."

"The electrolytic decomposition produced by the electric current in an alkaline aluminate, or in an alkaline earthy aluminate, can also be produced equally well whether this salt be in a state of purity or whether several aluminates be mixed together, or whether they be mixed with other salts or foreign materials giving rise to double salts or any secondary combinations whatever, provided, let it be understood, that these salts or foreign materials, whatever they may be, will not produce decomposition of the aluminates employed. It is thus that I reserve to myself to introduce into these baths salts of ammonia, alkaline sulphites, alkaline phosphates, alkaline cyanides, alkaline chlorides, etc., the presence of which seems to have the power of improving the practice of this electrolysis."

Later on, Fuerst deposited an addition to his patent, in which he says:

"In this certificate of addition I claim as my industrial property my process for the industrial production of aluminum by electrolysis of alkaline aluminates or alkaline earthy aluminates in solution or igneous fusion. And by 'alkaline aluminates,' I mean every compound into which alumina and alkaline base enter, even if there should enter into that compound one or more of the following bodies, which I shall call 'useful' or 'indifferent' auxiliary bodies: Hydro-cyanic acid, cyanides, cyanates, phosphoric acid, (pyro and meta,) boric acid, silicic acid, hydrofluoric acid,—in the state of acids or salts. For me there is aluminate of alkali as soon as there is in a body alumina and an alkaline base, even in the presence of the auxiliary bodies above mentioned, whatever otherwise be the hypotheses that might be established respecting the numerous molecular groupings which might exist or be supposed to exist."

An alkaline aluminate is either an aluminate of potassa or an aluminate of soda. Aluminate of soda is a compound of alumina and soda, i. e. of the oxides of aluminum and sodium. It is a triple compound of oxygen, aluminum, and sodium. An alkaline earthy aluminate is an aluminate of baryta, strontia, lime, or magnesia, i. e. a compound of alumina with baryta or strontia or the other substances. The three elements of such a compound are oxygen, aluminum, and barytum, or strontium, or the other substances.

The theory of the patent—and it is only a theory, as we shall see—is that if these triple compounds of oxygen, aluminum, and some other metal can only be reduced to a liquid form either by aqueous solution or igneous fusion, the current will decompose the compound by depositing the aluminum at the cathode, and will leave the compound of oxygen and the other metal in the bath. By adding alumina to the bath he proposed to restore the aluminate in the bath. Now, the electrolysis of an aqueous solution of the aluminates to produce aluminum is impossible. This is not denied. One half of Fuerst's patent is demonstrably inoperative. Secondly, so far as the patent calls for the igneous solution of the aluminate of soda, it is also inoperative, because that compound is infusible; and even if it were fusible, the current would precipitate the sodium, and not the aluminum. This is conceded by defendant's experts. Such facts are strong evidence that Fuerst wrote out a theory for the production of aluminum by the current without knowing by experiment whether it would work or not. All the experts in the case agree that he was a very poor chemist. In order, however, to catch future inventors in the toils of his dragnet, he mentions a great many chemical compounds which could be added to his bath of aluminates, and not interfere with its working, and might even aid the electrolysis. It is perfectly obvious that he never tried any of them, and it has not been shown at the bar that one of the innumerable baths proposed by him would, when electrolyzed, produce aluminum. It does appear, however, that if hydrofluoric acid, which is one of the indifferent auxiliary bodies mentioned by Fuerst, be mixed with aluminate of soda so that the mixture shall contain eight times as much acid as aluminate, the acid will entirely decompose and destroy the aluminate, and, after evaporation and fusion, we shall have a bath, not of the aluminate at all, but of the fluorides of aluminum and sodium. If, then, alumina be added, and the current applied, we shall have the Hall process exactly. An experiment of this kind was tried on behalf of defendant, and an account of it is produced in evidence as demonstrating the identity of the Fuerst and Hall processes. It is perfectly evident that no one without a knowledge of the Hall process, and without the deliberate intention of producing Hall's bath, would ever have derived from the Fuerst patent any information leading to such a treatment of the aluminate of soda with the hydrofluoric acid. In the first place, according to Fuerst's specifications, the acid is to be only indifferent or auxiliary. Who would think, therefore, of using eight times as much acid as aluminate in preparing an aluminate bath? Again, one imperative injunction which Fuerst imposes in his specifications was flatly disobeyed in defendant's experiment. He says he has no objection to the introduction of foreign materials as indifferent or auxiliary bodies, "provided, let it be understood, that these salts or foreign materials, whatever they may be, will not produce decomposition of the aluminates employed." The addition of hydrofluoric acid in excess to aluminate of soda completely decomposes and destroys the aluminate, so that the bath which results after evaporation and fusion has nothing like an aluminate in it, but is a bath of fluorides. In view of the necessity for

this flagrant violation of Fuerst's injunction in order to produce the Hall bath, it is absurd to say that the bath can be found described within the four corners of the Fuerst patent. Fuerst does suggest that his bath can be kept constant by adding alumina, but, as his bath is not Hall's bath, he does not thereby come any nearer the Hall patent.

The other patents pleaded as anticipations of Hall's are even less like it than those already considered, and they were not pressed in argument.

It is objected to the validity of the Hall process that it is not operative. The argument is that it has no utility, as described in the patent, for three reasons: "First, because the fusion of the bath is maintained by external heat, and except with internal heat, produced by the current, the process is worthless and inoperative; second, because it contemplates continual interruptions in the process to remove the aluminum already deposited from the cathode, which would make the process too cumbersome and expensive for commercial use; and, third, because it does not provide for sprinkling powdered alumina over the top of the bath, to be gradually stirred down into it, without which the depositing of aluminum cannot go on without interruption.

There is nothing in any of these claims. The patent disclosed a process and suggested an apparatus by which the process could be operated. Said Mr. Justice Grier in Corning v. Burden, 15 How. 252, 267:

"A process eo nomine is not made the subject of a patent in our act of congress. It is included under the term 'useful art.' An art may require one or more processes in order to produce a certain result or manufacture. The term 'machine' includes every mechanical device or combination of mechanical powers and devices to perform some function or to produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature or of one substance to another, such modes, methods, or operations are called 'processes.' A new process is usually the result of a discovery; a machine, of invention."

Mr. Justice Bradley, in Tilghman v. Proctor, 102 U. S. 707, 728, in speaking of what was required in the specifications for a patent of a process, said:

"If the mode of applying the process is not obvious, then a description of a particular mode by which it may be applied is sufficient. There is, then, a description of the process, and one practical mode in which it may be applied. Perhaps the process is susceptible of being applied to many modes, and by the use of many forms of apparatus. The inventor is not bound to describe them all in order to secure to himself the exclusive right to the process, if he is really its inventor or discoverer. But he must describe some particular mode or some apparatus by which the process can be applied with at least some beneficial result, in order to show that it is capable of being exhibited and performed in actual experience."

Now, it may be that the changes in the mode of using the Hall process, indicated in the objections of defendant. stated above, from that recommended by Hall in his patent, are great improvements, but that does not in the slightest degree affect the validity of the patent if it appear that at the time when the application

was made a new and useful result could be accomplished with the process by the mode which Hall suggested.

It is pressed upon us that after Hall made his discovery he worked on his processes unceasingly for a year or more under the auspices and with the aid of the defendant company, but that with the apparatus described in the patent he was able to accomplish no useful result. It is said that not until he adopted the improvements above named, which are not included in his patent, did his process prove operative. The area of Hall's discovery was a wide one. The chemical substances within the scope of his patent which he might use in carrying it to a successful result were many, and he was in search of that method and those substances within the limits of his discovery which would most easily and economically produce aluminum. It does not at all reflect on the utility of his processes that he should have been a year or more experimenting to determine just exactly what apparatus to adopt. Nor is it surprising that with lack of experience in the practical operation of the process, with no means to try it on a commercial scale, he should meet with difficulties in small experiments which disappeared afterwards. It is no evidence at all, therefore, of the inutility of his method of applying the process that by nine months' experimental work under the auspices of the defendant company he did not satisfy its officers that he had made a valuable discovery. During that time he did satisfy the practical chemists who, immediately upon his leaving the Cowles Company, invested $20,000 in a plant to produce the aluminum commercially, according to Hall's patent.

The apparatus suggested by Hall consisted of a crucible of iron or steel, lined with carbon, and placed in a furnace. The double fluoride was put in the crucible, which was then subjected to the heat of the furnace until the fluoride was fused. The poles of an electric dynamo were connected with the bath, the negative pole connecting with the carbon lining, and making that the cathode, while the positive pole was connected with a piece of carbon suspended over and extending down into the fused mass. Alumina is added to the bath when fused, and an electric current of from four to six volts deposits aluminum on the bottom of the crucible. When a sufficient quantity has been deposited, the patent says that the melted aluminum may be removed from the bath by suitable means, or the bath may be poured out, and the aluminum picked out. It is said that there are insurmountable difficulties in this apparatus. The carbon lining of the crucible must, on the one hand, be thick, to prevent the fluorides from attacking the steel or iron underneath it, and to prevent the radiation of heat and consequent cooling of the bath; while, on the other hand, it must be thin, to enable the heat of the furnace to get through the sides of the crucible to fuse the bath and maintain the fusion. That there may have been better ways of applying the heat than that suggested is doubtless true; but it does not appear that the mode just described would not make aluminum, and the burden of proof on this point is on the defendant. On the contrary, the

evidence is quite satisfactory that it would do so. The system was used by the complainant company for several weeks after its new plant was put in, and aluminum was made commercially as it had been made experimentally by Hall. The whole new plant was so constructed that heat could be applied exactly as Hall's patent suggests. This is strong evidence that neither Hall nor the men who put in $20,000 on the faith of his invention inferred from the result of his experiments that the difficulty above stated was a serious one. After several weeks' operation, it was found that the resistance of the bath to the electric current necessary to decompose the alumina produced heat enough to keep the bath in proper fusion without external heat, so the furnace was not used. Hall had said early in his experiments that such a result was likely when the process was carried on in a large way. It is probable that a manufacturer of aluminum according to Hall's patent, who would use external heat only, (if, indeed, it were possible to make aluminum extensively without generating electric heat more than enough to fuse the bath,) could not compete, for economical reasons, with one who discarded external heat, and depended alone on the heat of the current. But that is far from saying that such useful results cannot be obtained from the use of Hall's first apparatus with external heat as to entitle him to an exclusive right to his process, whatever the improvements on his apparatus in applying that process. To hold otherwise would impose upon the patentee of a process, in order that he may enjoy the monopoly, the necessity of stating in his patent not only the process and suitable apparatus for its operation, but also the very best possible apparatus for that purpose. This would be absurd, and quite in conflict with the spirit of Justice Bradley's remarks in Tilghman v. Proctor, above quoted.

The same remarks apply to the other criticisms of Hall's first mode of putting his process into practice. More than that, the ladling out of the melted aluminum without emptying the crucible, and the adding of powdered alumina to the bath, are not even improvements upon Hall's first method, but are quite within it. He says that alumina shall be added to the bath. It was to be added for solution. It does not even take knowledge of chemistry to lead one to grind a substance to powder to facilitate its solution, nor does it require any invention or discovery to use a ladle to remove molten aluminum from the bottom of a crucible without emptying the crucible of its other and less weighty contents.

Hall's process is a new discovery. It is a decided step forward in the art of making aluminum. Since it has been put into practical use the price of aluminum has been reduced from $6 or $8 a pound to 65 cents. This is a revolution in the art, and has had the effect of extending the uses of aluminum in many directions, not possible when its price was high. An effort has been made to show that this reduction in the price is due to the improvements in the application of electricity to the manufacture of aluminum. That the new inventions in the line of producing electric currents of

great volume and intensity have contributed to render the Hall process an economical one is true, but without the Hall process the manufacture of pure aluminum must have continued to be a purely chemical one. The Cowles brothers made aluminum alloys by the use of electrical furnaces which they have brought to a high state of perfection, doubtless, and that had an effect to reduce the price of aluminum alloys, and perhaps indirectly affected the price of pure aluminum. The fact was that the price of pure aluminum was so high that its uses were few, and the market for it was small. When Hall's process, however, came into the field of commercial manufacture, pure aluminum was largely substituted for aluminum alloys, and, if alloys are now desired for particular purposes, they are generally made from pure aluminum. Hall was a pioneer, and is entitled to the advantages which that fact gives him in the patent law.

One other thing must be alluded to before we close this long discussion of the validity of Hall's patent, and that is the French patent of Heroult. Heroult has a patent granted to him by the French government, dated April 23, 1886. The process he described is substantially one of those described by Hall. He uses a fused bath of cryolite in which alumina is dissolved, and from which, by the electric current, aluminum is deposited at the cathode. His anode is of carbon. Heroult made application for a patent to the United States patent office May 22, 1886. Hall did not make his application until July 9, 1886. An interference was declared in the patent office between Hall and Heroult. Hall adduced evidence to show the commissioner of patents that he made his invention and put it into operation February 23, 1886. The same evidence has been introduced here. It establishes beyond all reasonable doubt by written evidence that Hall did put his process into successful operation on February 23, 1886. The patent office decided the interference proceeding in Hall's favor, and it was clearly right. There was no evidence, there or here, to show that Heroult discovered the process before Hall, and the fact that Heroult's French patent antedates Hall's application does not affect Hall's right to a patent, because by section 4887, Rev. St., an inventor's right to a patent in this country is not debarred by reason of the fact that the invention has previously been patented in some other country, provided that it has not been more than two years in use in the United States. The counsel for defendant do not dispute the correctness of this conclusion, but they rely on the Heroult interference proceedings to attack the validity of that part of the second claim in the Hall patent where he specifies as part of his process the use of a carbonaceous anode. It is conceded by them that Hall had used a carbon anode in his process before filing his application, but the contention is that because in his application he alluded to it as having some disadvantages, and did not include it in his first series of claims, which he afterwards amended, and did not finally include it in his claims until Heroult's patent suggested its value to him, and more than two years after his application, he thereby abandoned the use of a carbon anode to the public. No authority is cited to sustain this ar-

gument. The proceedings in the patent office are for the purpose of reducing the description of the real discovery and the claims to such a form that a patent may properly be granted for them. Until the patentee accepts the patent, he cannot be held impliedly to disclaim anything in his real discovery. If he makes a claim which is rejected, and he accepts the patent without the claim, then he waives the right to a monopoly therein. But we know of no principle by which such a waiver can be implied from defective claims in the proceedings preliminary to the issuance of a patent if the claim is fully set forth in the patent as granted, and admittedly covers only that which the patentee had discovered before he made his application, and which he fully described therein.

And now we come to the question of infringement. The evidence leaves no doubt that the defendant company began their manufacture of pure aluminum in January, 1891, with the aid of one Hobbs, who had been the foreman of the complainant company, and engaged for it in superintending the manufacture of aluminum by the Hall process. By that time the complainant company had adopted several improvements in the apparatus described in the patent for working the process. The defendant copied these improvements, as well as the process, and has sought to escape responsibility by maintaining that without these improvements the process was inoperative, and the patent which did not contain them was invalid. Much the same course is taken as to the defense of infringement. The improvements are said to make the present process a different one from that described in the patent, and therefore the defendant does not infringe. It is needless to say that a court is not inclined to favor such defenses. There is evidence tending to show that the defendant used Hall's preferred bath, but with the admissions in this case it is unnecessary to consider the issue made on that point. It is admitted that the defendant is using a process in which alumina is dissolved in a fused bath of the double fluoride of aluminum and sodium, and in which an electric current is passed through the bath containing the alumina thus dissolved, whereby aluminum is deposited at a carbon cathode and oxygen is released at a carbon anode. It is said, however, that they are not infringing the Hall patent, because the Hall patent does not cover the particular double fluoride of aluminum and sodium which they are using, which is cryolite; and because the Hall process contemplated and called for a fusion of the double fluoride by external means of heating, whereas the defendants are using, to fuse the bath, the heat generated by the resistance of the bath to the electric current. The whole defense of infringement is based on a narrow and wholly impossible construction of the Hall patent.

As has been before stated, this patent is a pioneer patent, and its terms will be liberally construed to cover the patentee's real discovery. Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. Rep. 799; Sewing-Mach. Co. v. Lancaster, 129 U. S. 263, 273, 9 Sup. Ct. Rep. 299. Coming now to consider the claim that the patent does not cover fused cryolite as a bath, it should first be noted that cryolite is a double fluoride of aluminum and sodium, a metal more

electro-positive than aluminum. It is therefore exactly within the words of both claims here in suit. But the contention is that the patentee has disclaimed any right to the exclusive use of cryolite. It is not denied that the patentee had used cryolite as a bath before he made his application, but it is said that he described its use in his first application, and stated, in substance, that it was not so good as a different proportion of the fluorides, and then subsequently omitted reference to it as a bath altogether in his final specifications. This is said to be a disclaimer of cryolite as a bath material. Hall's description of his bath is as follows:

"In the practice of my invention I prepare a bath for the solution of the alumina by fusing together in a suitable crucible, A, the fluoride of aluminum and the fluoride of a metal more electro-positive than aluminum,—as, for example, the fluoride of sodium potassium, etc.,—these salts being preferably mingled together in the proportions of eighty-four parts of sodium fluoride and one hundred and sixty-nine parts of aluminum fluoride, represented by the formula $Na_2Al_2F_8$. A convenient method of forming the bath consists in adding to the mineral cryolite 358-421 of its weight of aluminum fluoride. The object of thus adding aluminum fluoride is to secure in the bath the proper relative proportions of the fluorides of aluminum and sodium."

And again the patentee says:

"While I consider the proportions of fluorides of sodium and aluminum hereinbefore stated as best adapted for the purposes, such proportions may be varied within certain limits, without materially affecting the operation or function of the bath, as, in fact, any proportions which may be found suitable may be employed."

The patentee states first the proportion of the aluminum fluoride and sodium fluoride which he prefers for his bath. They are 84 parts of sodium fluoride and 169 parts of aluminum fluoride. Then he proceeds to tell a convenient way for reaching those proportions. Cryolite, as we have said, is an article of commerce. He suggests that the best bath can be made by taking cryolite and adding to it 358-421 of its weight in aluminum fluoride. After this, for the very object of including cryolite, which, as we know, he had used for the purpose, and all other double fluorides of sodium and aluminum which would work, he says that the proportions may be varied. What proportions does he mean? Why, the proportions of the two fluorides, of course. The labored construction that the proportions to be varied are those of the cryolite and the aluminum fluoride is wholly untenable. How may they be varied? Within certain limits. What does that mean? The patentee goes on to state when he says "that any proportions which may be found suitable may be employed." Cryolite is now found suitable, and the patentee had found it suitable when he made his application. Could anything be more unlikely than that Hall or his patent solicitor, after they had been successful in an interference controversy with Heroult, whose only bath was one of cryolite, would have framed his specifications with the intention of not including a cryolite bath in the monopoly he was seeking? We think the patent very aptly drawn to cover the use of every double fluoride of aluminum and sodium which can be made to produce aluminum

when used as a bath in the Hall process. The proportions are immaterial so long as it is a double fluoride of these metals.

Next is the defense based on the use of external heat in Hall's apparatus as described in his patent, and defendant's use of internal heat. Hall's claims do not say what heat shall be used to fuse the bath. The process is described as beginning with a fused bath. The argument is that because Hall in his specification describes an apparatus for the fusion of the bath by external heat, therefore he limits himself to a process in which external heat is used, and confers upon the world at large the right to use his process if only some other mode of applying the heat is employed; and this in the face of the words of the patent: "Nor does this apparatus described herein with more or less particularity form any part of the invention herein." We do not see how the patentee could have used stronger words to avoid the difficulty in which defendant wishes to involve him. Then, too, we have the refined point that the language of the claim itself excludes the possibility of electric heating because it speaks of dissolving alumina in a fused bath of the double fluorides, "and then passing an electric current, by means of a carbonaceous anode, through the fused mass." This language is as applicable to electric heating as to any other. The word "then" is used to indicate that the electrolysis is to follow the solution of the alumina in the fused bath. Now, whether the current or a furnace fire fuses the bath, the current which is passed through the fused mass to perform electrolysis is passed through after the fusion. The decision of the supreme court in the case of Tilghman v. Proctor, 102 U. S. 707, is conclusive on this point. There the patent was for a process for the treatment of fats and oils, in which the application of heat was one of the necessary steps. Mr. Justice Bradley, speaking for the court, said:

"Another ground assumed by the defendants to avoid the charge of infringement is that they do not heat the mixed mass in the manner pointed out in Tilghman's specification; but, instead of heating the containing vessel by an outside application of heat, they heat the contents by the introduction of superheated steam. But we think that this does not alter the essential character of the process. The heating by steam is clearly an equivalent method to that of heating by an external fire. The patent does not prescribe any particular method of applying the heat, except when using the pipe and coil apparatus described in the specification; and even in the use of this apparatus the outward application of the heat to the pipe is suggested incidentally and as a matter of convenience, rather than as an essential requisite. The patentee showed one method in which the heat could be applied. That was all that was necessary for him to do. If it could be applied in any number of different methods it would not affect the validity of the patent as a patent for a process. The method of heating the mixture by the introduction of steam may be attended by some beneficial results in producing an agitation, or an automatic circulation helpful to the perfection of the admixture of the water and fat; and so far it may be an improvement on heating from without. Suppose this to be so, as before said, the introduction of an improvement gives no title to use the primary invention upon which the improvement is based."

Finally, it is said the defendant does not infringe, because the claim calls for a carbonaceous anode and the defendant uses a

carbon anode. "Carbonaceous" means "pertaining to carbon," or "made of carbon." It includes anodes made partly of carbon and partly of some other substance, but it certainly covers an anode made all of carbon.

A decree will be entered for the complainant, finding that complainant's patent is valid, and that the defendant infringes both the first and second claims thereof, and perpetually enjoining the defendant from further infringement, with the usual reference to a master to determine the damages.