## HILLARD v. FISHER BOOK TYPEWRITER CO.

### (Circuit Court, S. D. New York. February 9, 1907.)

**1. PATENTS—INVENTION AND INFRINGEMENT—TYPEWRITER ESCAPEMENTS.**

The Hillard patent, No. 580,281, for improvements in typewriter escapements, the principle of which is the utilization of the carriage-propelling power for the re-engagement of the members of the escapement and the return of the key and typebar to normal position synchronously with the feed of the carriage, was not anticipated, and discloses invention of a high order, and the claims are entitled to a broad construction as limited by the prior art and a liberal application of the doctrine of equivalents, as covering, in a limited sense, and in the particular field of the art to which they relate, a pioneer invention. Claims 30 to 35, inclusive, and 37, 38, and 41, also *held* infringed.

**2. SAME—VALIDITY—SUFFICIENCY OF DESCRIPTION.**

It is immaterial whether or not the means for accomplishing a result covered by a patent are illustrated therein, if they are sufficiently described in the specification.

**3. SAME—NONUSE OF PARTS.**

If a patentee shows a new result to be attained, and means which are new and novel for attaining that result, and the device indicated is operative, his patent is good, even if in subsequently applying it he varies the means employed by substituting equivalents.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 40.]

In Equity. Suit to restrain alleged infringement of claims 30 to 35, inclusive, and claims 37, 38, and 41, of United States letters patent No. 580,281, dated April 6, 1897, to Frederic W. Hillard, for new and useful improvements in typewriter escapements, and for an accounting.

Kerr, Page & Cooper (Thomas B. Kerr and John C. Kerr, of counsel), for complainant.

Philip T. Dodge (D. Walter Brown, of counsel), for defendant.

RAY, District Judge. The patent in suit, No. 580,281, to Frederic W. Hillard, issued April 6, 1897, application filed January 9, 1893, for new and useful improvements in typewriter escapements, contains 42 claims, 9 only of which are in issue; but these cover an invention, if it be that, which has gone into general use, commanded attention and respect, and forced a confession of its utility even from the defendants' experts in this litigation. That its introduction into the manufacture of typewriting machines wrought a great improvement in speed, neatness of work, and ease and accuracy of operation cannot be successfully controverted. The defendant, however, contends that a result cannot be patented, which contention is true, as the means for producing the desired result is what are patentable. And hence is presented the questions whether complainant's patent discloses patentable invention, in view of the prior art, the scope of that invention, and whether or not defendant infringes if invention is disclosed. Patentable invention is not, however, denied. Infringement is. The defendant says:

"This suit is an attempt by the patentee of a machine to hold tributary to his patent every other machine in the same art which attains the same mechanical result, however much the constructions and modes of operation of such other machines differ from his. It is a settled principle of patent law that a result cannot be patented, but the complainant here attempts to ac-

complish the same end, by the contention that his patent covers every combination of mechanical parts in a typewriter which accomplishes the same result as is accomplished by his patented combination, however greatly the elements of the combinations in other machines differ in construction and mode of operation from the elements of his combination."

Defendant also says:

"But the only issue in the suit is whether this patentee, and with the prior art as it is, can broadly cover every combination in a typewriter of a carriage and carriage-propelling power, and escapement and finger keys, wherein the carriage propelling power assists in returning the escapement to normal position and in lifting a finger key after the key has been depressed, without regard to the construction and mode of operation of the elements of such combination."

And it may be well to insert here the grounds of defense as stated by the defendant:

"(1) Noninfringement, and that from a time prior to the grant of the patent to complainant the defendant has manufactured and sold, under patents granted to and inventions owned by said defendant, the typewriter escapement and machines for which it is now sued.

"(2) That, if the claims sued on are expanded so as to cover defendant's construction, then the claims are anticipated by complainant's prior patents and by the prior art.

"(3) That the application upon which the patent in suit was granted was unwarrantably expanded in the Patent Office to cover inventions not fairly within the scope of the said application as filed.

"(4) That complainant's cause of action, if any there ever was, is defeated by reason of his laches in not bringing suit against this defendant for many years after complainant well knew defendant was manufacturing the very identical machines and escapements upon which he finally brought suit."

If the defendant has manufactured and sold the typewriter escapement covered by the Hillard patent in suit, contained in typewriters or otherwise, under patents granted to, and under inventions owned by, the defendant, it has been done since the complainant made his invention and filed his application for his patent, and has been done without the consent or acquiescence of the complainant or of his licensees or agents, and has been in violation of his rights, if any. No prior patent covers the Hillard invention.

As to the defense of laches, I do not find any evidence in the case that will justify the charge of unreasonable delay in bringing suit; clearly none that he has unreasonably delayed suit after knowledge of defendant's acts. I have carefully examined the proceedings in the Patent Office in reference to the claims of this patent while it was there under consideration, and am decidedly of the opinion that the application, or claims, was not improperly or unwarrantably expanded. What was done was more to "separate wheat from chaff" and mold into proper form the real claims and invention disclosed in the original claims and specifications. I do not consider it necessary to travel over the route followed by the original application and point out the modifications and changes. The history would be too long. The patentee, Hillard, a most competent and skilled man of experience in typewriter construction and needs, and also a person of integrity, in the specifications, says:

"My invention is an improvement in typewriter escapements; its aims being to attain a uniform and certain feed at high speed by controlling the moment

of release of the paper-platen, to avoid the blurring incident to movement of the paper at the instant of printing,· whether in feeding or by reason of irregular action of the machine, and to secure an escapement which by its action polishes its contacting surfaces. An important feature of my invention consists in an escapement comprising two engaging members; which are disengaged and re-engaged to effect the spacing, in which the spaced member—that is, the member of the escapement which moves forward step by step with the paper-platen as the paper is fed—is also movable transversely with respect to the other member of the escapement to effect the step by step movement in the spacing. Both members may be movable transversely with respect to each other, as in the forms shown in Figures 1 to 9 and 15 to 20, inclusive, of the accompanying drawings, or the spaced member may be alone transversely movable; the other member being stationary, as in the form shown in Figs. 10 to 14, inclusive.

"My invention also comprises, broadly, means for bringing the carriage-propelling power into action with the key while the key is depressed, and for thereby employing the force of the propelling power to aid in lifting the key and in re-engaging the disengaged members in the escapement and in restoring the printing member to normal position synchronously and in unison with the feed of the paper-carriage.

"In its narrower aspect my invention consists in the various specific forms of escapement hereinafter described and claimed."

It will be seen that he first points out the aims and objects to be attained, and which had not before been attained, and then generally the improved means to be employed in attaining these ends and purposes. He then goes into detail in describing these mechanical means aided by extensive drawings shown in Figs. 1 to 20, inclusive. These details and drawings cannot be reproduced here. After and in describing certain means he says, among other things:

"The universal bar will thus be lifted, carrying with it the key and drawing down the type-bar, which is attached to the key-lever by its connecting-wire. This movement cannot be effected if the key is held down, but the effect of the mainspring will be to give an upward impulse to the key, which will cause the operator to remove his finger. This I call a 'repulser effect.' I have shown and described what I designate as a 'repulser,' and have claimed it broadly in my patent No. 577,982, dated March 2, 1897. The repulser effect will be felt by the operator at a moment not later than the instant of actual printing if the position of screw 13 is adjusted to throw the rack onto the spacing-dog at or before the instant of printing. The advantage of so timing the impulse is that the operator will never hold a key down after the type has struck the paper once, and the type therefore will not rebound and print supernumerary impressions or 'ghosts.' This impulse on the key and type-bar is referred to in the claims, where it is specified that one or both of them are started toward normal position. * * * In the constructions which I show in this application, excepting Figs. 10 to 14, the mainspring performs the functions mentioned by drawing the carriage forward after its disengagement from the detaining-dog during the stroke on the key, and before the rack comes into collision with the spacing-dog, and then it acts as a repulser by imparting an impulse through the spacing-dog to the key, by which the operator is notified that the key has been depressed sufficiently for printing and by which he is assisted in lifting his finger in time to avoid blurring and double impressions in the print.

"During the depression of the key, the spacing-dog, 8, which normally engages with the rack, 14, is disengaged from the rack, and the detaining-dog, 9, engaged therewith, and the spacing-dog, 8, is cammed backward, as above described, by the longitudinal arm, 11, pressing on the support, 7. As the key is still further depressed, the screw, 13, engages with the rack, 14, and swings the rack off from the detaining-dog, 9, and into the path of the spacing-dog, 8. The carriage will then be fed forward by the mainspring until the face of the rack-tooth comes into engagement with the spacing-dog. The forward feed

of the carriage will then be checked so long as the key is held down, but the pull of the mainspring still tends to feed the carriage forward. But the mainspring can then only feed the carriage forward by lifting the longitudinal arm, 11, on the dog, 8, and by thereby returning the rocker-frame to normal position and lifting the key. Hence the mainspring tends to repulse the key and notify the operator as soon as the rack comes into collision with the spacing-dog, 8; but, in addition to this novel repulser function which is performed by the mainspring, I have also provided means for retracting the carriage and for holding it stationary while the key is depressed and the type held against the paper, so that if the operator fails to heed the signal and does not lift his finger soon enough to avoid blurring in the print, but, on the contrary, continues to depress the key, he will simply retract the carriage in case a legato blow has been struck and the carriage spaced too far forward, and he will then hold the carriage stationary so long as the type-key is depressed and held against the paper. On the other hand, if a staccato blow is struck, the carriage will, as above stated, be fed forward during the stroke through only a portion of the distance which it would traverse if a legato blow were struck. Hence, in this case, if the operator fails to heed the repulser-signal, and does not lift his finger in time to avoid the blurring in the print, the carriage will simply be stopped in its advanced position and held stationary until the key is released. * * * In the modification shown in Figs. 15, 16, and 17 the escapement is the same as that of Figs. 1 to 5, except that the locking device is different and differently located, the pushing-point that contacts with the inner or front face of the rack is higher than that which contacts with the outer face instead of being lower, as in Figs. 1 to 5, and the rack is not supported on a friction-joint and is normally in mesh with the detaining-dog instead of the spacing-dog. With this device the rack is not necessarily released from the detaining-dog until the key is released. The rack, 14d, is normally in mesh with the detaining-dog, 9d. During the depression of the key the parts pass through the position of Fig. 16 into the position of Fig. 17. In this position the rack may be entirely or only partially released from the detaining-dog. If the rack is thrown entirely from the detaining-dog and onto the reciprocating dog, the mainspring will tend to lift the key just as heretofore shown respecting Figs. 1 to 5 and to return the type into the basket and to re-engage the disengaged members in the escapement. * * * Figs. 18, 19, and 20 show a device similar to that of Figs. 15, 16, and 17, except that there is no locking device for the rack, 14e, and therefore the screw, 13e, must be so adjusted as certainly to push the rack onto the spacing-dog during the downstroke of the key. During the down stroke the parts pass from the position of Fig. 18 through that of 19 to that of 20. The repulser effect is immediately transmitted from the mainspring to the key, the operator lifts his finger, and as the rocker-frame is carried back by the spring, 6e, the rack moves off from the spacing and onto the detaining dog; but the carriage is not released until the key is released.

"The operation of the parts shown in Figs. 18 to 20 is as follows: The rack, 14e, is normally in engagement with the detaining-dog, 9e, and disengaged from the spacing-dog, 8e. During the depression of a key the spacing-dog is cammed backward or to the right by the camming-arm, 11e, and simultaneously the rack is pushed by the screw, 13e, off from the detaining-dog onto the spacing-dog. As soon as the rack has been disengaged from the detaining-dog it is pulled forward or to the left by the mainspring until it comes into collision with the face of the spacing-dog. Then, if the operator still continues to depress the key, he will overcome the pull of the mainspring and retract the carriage, with the dog, to the right, until the dog comes against the screw, which limits its vibration in that direction. Upon release of the key the mainspring, acting through the rack and the spacing-dog on the camming-arm, 11e, assists the spring, 6e, in returning the rocker-frame to its normal position."

Hillard has referred to his prior patents, and distinguishes or differentiates them from the patent in suit. The swinging rack form of buckle-joint escapement described in the patent in suit was reserved when patent No. 554,874 was granted. It is the second improvement

described or referred to in the words commencing "My invention also comprises, broadly, means for bringing the carriage-propelling power," etc., already quoted, that is the subject-matter of the claims involved in this suit. In complainant's former patent he accomplished the purpose, or one main purpose, of the patent in suit by a separate device, not by the mainspring which was there used for feeding the carriage only. This invention also cams the carriage back when a long or slow blow is struck, and that was done in prior patent No. 554,874, but in a different way and by somewhat different means. This invention also uses the mainspring to re-engage the members of the escapement and restore the printing member and the finger key to their normal position as well as to move the carriage. In the prior Hillard patents the following functions are not performed by the mainspring, as I can see: (1) Producing the repulsion of the finger key, (2) camming back the carriage unaided by a separate cam, (3) re-engaging the escapement members, and (4) restoring the type-bar and the finger key to normal position by its own force. For these, and other reasons, it seems to me that the patent in suit is not anticipated by Hillard's prior patents. I do not think the patent in suit is limited to the buckle joint or to the use of the other improvements of the patent with it. It may be that the improvements of the claims in suit are illustrated in the drawings of the patent in connection with the buckle-joint escapement only, but that is in no way conclusive that they are so limited. The patentee says, as already quoted:

"My invention also comprises, broadly, means for," etc. "I have shown and described in this specification several distinct but co-operating improvements in typewriter escapements. While these improvements are all mutually beneficial, they are not dependent on one another, and either one may be employed without the others," etc.

It seems to me that this is quite satisfactory and conclusive on this subject. The fact that the alleged improvements are illustrated in the drawings as connected with the buckle-joint escapement is in no wise conclusive, as it is only one mode of using them, and we have the express statement that they are not dependent, and that any one can be employed without the others, and this applies to their use in connection with the buckle-joint escapement.

In claim 41 we have in combination: (1) The key, or the ordinary letter or space key, by pressing which the operator of the machine does the printing and spacing. This pressure of the key also operates the escapement. (2) The carriage-propelling power, meaning the mainspring or any equivalent device; anything, I think, that constantly draws the carriage forward from its starting point. (3) An escapement, or toothed rack on or connected with the carriage, which is the rack member, connected with the rocking-frames, or dog-member, which is operated by the key and which operates with the rack member to control the forward movement of the carriage. That claim reads as follows:

"(41) In a typewriter, the combination of a key, carriage-propelling power, an escapement, and means for bringing the propelling power into action with the escapement to lift the key when the key is depressed, substantially as described."

In the specifications, 14 is the rack; the rocker-frame carries the spacing-dog, 8, and the detaining-dog, 9, and these dogs of the dog-member alternately engage the rack. The fourth element of claim 41 consists of "means for bringing the propelling power into action with the escapement to lift the key when the key is depressed." The specific means mentioned and described in the patent in suit consist of an arm, 11, on this spacing-dog, 8, co-acting with the support, 7. The propelling power acts through the escapement, bar, 5, links, 4, universal bar, 3, and key-lever, 2, to lift the key. These are shown in connection with a typewriter of the Remington form, but they have their equivalents in many other forms of typewriters, and their presence is understood. Of themselves they would not perform the function of bringing the propelling power into action with the escapement to lift the key. They must have the aid of the camming arm, 11, and of the support, 7, or their mechanical equivalents. For the purpose of this invention it is necessary that the propelling power be brought into action when the key is depressed, and it is so stated. And it is also essential that the repulser action shall not be manifested until the key has been so far depressed as to throw the type against the paper with such force as to do good work. Attention is here directed to the language of the specifications already quoted, commencing:

"In the constructions which I show in this application, excepting Figs. 10 to 14, the mainspring performs the functions mentioned," etc.

The function of camming back the carriage does not interfere with that of lifting the key. When the key is released, the power of the mainspring acts with the escapement through the rack, spacing-dog, rocker-frame, and its operating levers to lift the key. By this means the labor is reduced, and the operation hastened. In one of the constructions shown (Figs. 3–5) the members of the escapement are re-engaged by the operator during the downstroke of the key. In the modifications just considered they are re-engaged by the mainspring after the release of the key. The other claims in suit are limited in this particular.

After describing certain movements, the patentee says:

"The beveled edges of the rack-teeth and of the detaining-dog permit of the entrance of the dog into the rack before the carriage has been fed through the entire distance between the two rack-teeth."

And he has before said:

"My invention also comprises, broadly, means for bringing the carriage-propelling power into action with the key while the key is depressed, and for thereby employing the force of the propelling power to aid in lifting the key and in re-engaging the disengaged members in the escapement and in restoring the printing member to normal position synchronously and in unison with the feed of the paper carriage."

One of complainant's experts says:

"By utilizing the pull of the mainspring itself, the patentee provides that the force which spaces the carriage forward be utilized in returning the parts to normal position, ready for the succeeding stroke on the key. It is obvious that it would be useless to space the carriage with such speed that it would have to come to rest before the other parts are ready to repeat the stroke on the key, and that, on the other hand, it would be useless to return the parts of the

escapement, the type-bars, and the key-levers to normal position with great rapidity, unless means be provided for feeding the carriage at a rate proportionate thereto, as, if this were not done, defective spacing would ensue. In other words, the carriage, the escapement parts, the key-levers, and the type-bars must all preserve and have a certain fixed speed of movement in order to permit accurate work, and to increase the speed of writing the speed of movement of all these parts must partake of a similar and corresponding increase, and it would serve no useful function, in a machine otherwise well adjusted, to increase the speed of movement of one or more of these parts without increasing the speed of movement of the others. In the patent in suit the patentee has obtained this simultaneous variation in the speed of movement of all the parts, by actuating them by a single spring, namely, the carriage mainspring, so that any increase of power of this spring which would tend to feed the carriage with greater rapidity would be transmitted through the escapement mechanism to restore the escapement and key-levers and type-bars back to normal position with a correspondingly increased speed, and thus the adjustment of the single spring serves to adjust all the parts needing adjustment to meet the new condition."

Claims 30 to 35, inclusive, and claims 37 and 38, pertain to the re-engagement of the members of the escapement and the starting of the printing member back to normal position by the power of the mainspring. It is not necessary to describe them in detail. They read as follows:

"(30) In a typewriter escapement, the combination of two engaging members which can be disengaged and re-engaged, means operated by the keys for disengaging the members, and means operated by the carriage-propelling power for re-engaging the members, substantially as described.

."(31) In a typewriter escapement, the combination of a rack-member and a dog-member which engage together and can be disengaged and re-engaged, means operated by the keys for disengaging the dog-member from the rack-member, and means operated by the carriage-mainspring for re-engaging the two members, substantially as described.

"(32) In a typewriter, the combination of a printing member, and an escapement which comprises two engaging members that can be disengaged and re-engaged, means operated by the type-keys for moving the printing member to print and for disengaging the members in the escapement. and means operated by the carriage-propelling power for starting the printing member back to its normal position and for re-engaging the escapement members, substantially as described.

"(33) In a typewriter, the combination of a type-bar, and an escapement which comprises a rack-member and a dog-member which engage together and can be disengaged and re-engaged, means operated by a type-key for moving the type-bar to print and for disengaging the dog-member from the rack-member, and means operated by the carriage-mainspring for starting the type-bar back to its normal position and for re-engaging the dog-member with the rack-member, substantially as described.

"(34) In a typewriter escapement, the combination of two engaging members, one of which comprises two elements which alternately engage and disengage with the other member, means for normally engaging one of the elements with the other member, means operated by the keys for disengaging this element from the other member and for engaging the said other element therewith, and means operated by the propelling power for returning the normally engaging element into re-engagement with the other member, substantially as described.

"(35) In a typewriter escapement, the combination of a rack-member, and a dog-member which engages therewith and comprises two dogs which alternately engage and disengage with the rack-member, means for normally engaging one of the dogs with the rack, means operated by the keys for disengaging this dog from the rack and for engaging the other dog therewith, and

means operated by the carriage-mainspring for re-engaging the normally en-gaging dog with the rack, substantially as described."

"(37) In a typewriter escapement, the combination of two engaging members which can be disengaged and re-engaged, means operated by the keys for dis-engaging the members, and means operated by the escapement-retracting spring and the carriage-propelling power for re-engaging the members, substantially, as described.

"(38) In a typewriter escapement, the combination of a rack-member and a dog-member which engage together and can be disengaged and re-engaged, means operated by the keys for disengaging the dog-member from the rack-member, and means operated by the escapement-retracting spring and the car-riage-mainspring for re-engaging the two members, substantially as described."

The "means" of claim 30 are the rack-tooth, the spacing-dog pivoted at the point designated, whereby it is capable of a motion out of the rack oblique to the line of direction of feed of the tooth of the rack with which it is engaged, and the arm, 11e, bearing on the support, 7e. Claim 31 is more limited than claim 30. Claim 32 adds "a printing member" not limited to "type-bar," but includes, as the patentee says, type-wheel, hammer, etc. Comparing claim 3 with claim 30, it will be noted that its fourth element, "means operated by the carriage-pro-pelling power," etc., performs an additional function, viz., that of start-ing the printing member back to its normal position. By it the power of the mainspring is exerted on the printing member at the instant of printing, to withdraw it from the paper, and thereby prevent blurring and repeated impressions, a great fault in the prior art; and it also hastens the return movement of the printing member, and causes it to move in synchronism with the escapement, and hence increases the speed of the operation. Claim 33 is more limited than claim 32, as the printing member is a type-bar, and the engaging members of the es-capement are a rack and a dog, and the carriage-propelling power is a carriage-mainspring. Claim 34 differs from claim 30, mainly, if not entirely, in that one of the two engaging members "comprises two elements which alternately engage and disengage, with the other member," while the other is normally engaged with the other member. Claim 35 is more limited than claim 34. It says the two engaging ele-ments of the escapement shall be a rack-member and a dog-member, which shall comprise two dogs, one of which is to normally engage with the rack, while the propelling power shall be the carriage-main-spring. Claim 37 is the same as claim 30, except in that it includes the escapement-retracting spring which assists the carriage-propelling power in re-engaging the members of the escapement. Claim 30 in-cludes escapements which are not provided with a retracting spring for the purpose mentioned. It is desirable to use the escapement-retracting spring with this invention of this patent to aid the main-spring in returning the parts to normal position that the requisite speed may be attained by the use of the strong mainspring, and still not have the repulsion thereof felt to an excessive degree. The escapement-re-tracting spring does away with the excessive repulsion of the key when the strong mainspring is used and the necessity of using too much of its power to re-engage the members. This re-engagement may be effected by the mainspring alone, but there are great advantages in the use of the escapement-retracting spring as the more certain and efficient action

of some of the parts, uniform work, etc.  Claim 38, as is readily seen, is narrower than claim 37.

This invention of Hillard has introduced into the typewriter art new, useful, and novel features which actually revolutionized the business and increased enormously, not only the use, but the ease of use, of these machines, as well as their speed and the neatness and accuracy of their work.  This is not denied.  His claims have been recognized, and his merit as an inventor conceded.  It detracts nothing from his merit, and should not militate against the enforcement of his rights, that rich and powerful corporations have used and are using his invention without license or making compensation.  If his patent is infringed, he should have his remedy.  Hillard did not invent the typewriter, and hence is not the pioneer in the art; but in one sense, a limited sense, and in the particular field of the art to which his invention, but imperfectly and fragmentarily described here, relates, he was a pioneer.  His conceptions of ends to be obtained and of defects to be remedied were of a high order, as were his conceptions of new and useful means to be employed in accomplishing the desired results. He did what no one had done before, and what no one has done since, except in copying and utilizing his invention.  The complainant is entitled to a broad construction of his claims as limited by the prior art. They do not limit themselves by any language therein contained, except in respects pointed out.  I find nothing in the file wrapper excluding the construction now sought to be put on these claims.  All that Hillard abandoned in the Patent Office is excluded from the claims allowed. And hence we come to the question of infringement.  The claims of the patent in suit are, broadly stated, for the employment of the carriage-propelling power, or mainspring, or equivalent device, in and for the purpose of restoring the movable parts of the machine to their normal position, and include necessary means for so doing; but I find no claim for camming back the carriage.  Defendant, both in his evidence and brief, refers to the fact that the construction shown in Figs. 1 to 4 of Hillard patent, No. 554,874, dated Feb. 18, 1896, shows that it operates to utilize the mainspring for the restoration of the parts to normal position.  The specifications of that patent expressly state that no claim is made to that mechanism, but, says that patent, "I claim these forms in my other application for typewriter escapements, filed January 9, 1893, serial No. 457,800" which is the patent in suit.

The defendant contends that to find infringement the complainant's patent must be expanded to cover a function or result.  As already stated, a result cannot be patented.  The means for accomplishing a result may be.  The defendant further contends that the defendant's escapements do not include any element which is substantially similar in construction or mode of operation to a corresponding element of any one of the six structures illustrated and described in the patent in suit. Whether or not the means for accomplishing a result covered by the patent in suit are illustrated is immaterial.  The question is:  Has the complainant in the patent in suit stated what his invention is, the result sought to be obtained, and has he described in the specifications the means for obtaining that result?  A patent may be perfectly good, if

no illustration accompanies the description contained in the specifications. The defendant further contends that the essential elements of the defendant's escapements are neither the mechanical equivalents nor the substitutes of any corresponding essential elements of the patented escapements. From a careful examination of the exhibits in evidence and of the evidence in the case, I am unable to agree with this contention. The defendant cites examples, and says that we cannot substitute the laterally swinging rack and dogs of the patent for the escapement wheel and the dogs of defendant's machine, neither of which swing laterally, without reconstruction of defendant's entire escapement, and that we cannot substitute in the patented structures the non-swinging wheel-rack, nor the dogs which do not swing laterally, of defendant's escapement, without reconstruction of the entire patented structure. Defendant also says that the only similarity between the defendant's escapement and the patent is that the former to some extent attains the same result of utilizing the power of the mainspring to return the finger-keys and type-bars to normal position after a key has been depressed. The defendant therefore says that this situation has forced the complainant to contend that he is entitled to cover every typewriting machine in which the power of the carriage mainspring is used to return, or to aid in returning, the type-bars and finger-keys to normal position after the depressing of any key. The defendant further contends that the complainant is claiming to have monopolized two inventions, one an improvement in the escapement which includes the buckling action, the transverse movements, of the members of the escapement, and the use of the carriage spring for returning the finger key, which has nothing to do with the specific constructions described in the patent.

As already stated, I do not consider these contentions well founded. I think that the complainant has patented means for accomplishing certain new and novel results. In his patent and specifications he may have described many things which were done before. This was necessary to an intelligent understanding of his claims and of the means to be employed in accomplishing the desired results. The complainant, in the patent in suit, has pointed out, I think quite definitely, the means to be employed. Where the result to be obtained is defined, and that result may be obtained by the use of old means combined in a new way and operating in a new way to produce the result, there may be patentable invention. There can be no difference of opinion on the proposition of law that the mere movement of a machine, irrespective of the mechanism which causes it, is not patentable. The defendant says that the patented inventions have never been constructed. It is immaterial whether the structures pointed out in the patent in suit have been constructed or not. If the patentee shows a new result to be obtained, and means which are new and novel for attaining that result, and the device indicated is operative, his patent is good, even if in subsequently applying it he varies the means employed by substituting equivalents. Even if the patentee with a valid patent lies still and never makes or uses his patented device, he has the right so to do, and he may restrain the use of the patented device by any other person. Of course the facts that

a patented device is made and sold and finds an extensive market and supplies a long-felt want and supplants all other devices of a like nature are evidence on the question of patentability, when want of patentable invention is the issue; but the mere fact that it is a paper patent, conceding it to be valid, is no evidence of noninfringement. The defendant presses attention to Hillard's prior patent No. 554,874, and to this I have already referred. It also invites attention to the Cash patent, No. 717,347. The defendant contends that Hillard has admitted that the Cash specification described and claimed an ordinary escape- ment. A reference to the record demonstrates that this is error. Hillard's testimony is to the effect that the original specifications of the Cash patent described a reversed escapement, and that Cash sought by amendment to substitute an ordinary escapement. Hillard said:

"The escapement described and claimed in the amended specification is an escapement absolutely, entirely, and fundamentally different from the escape- ment originally shown and described by Cash in his original specification."

Again, he testified, as shown by the interference record:

"Since Cash filed his original application, he has entirely reversed the de- scription of his invention, so that, where he originally disclosed what is now known in the art as a 'reversed escapement,' he now discloses what is known in the art as a 'regular escapement.'"

Mr. Hillard was asked whether the Cash patent showed the in- vention in suit, and he answered emphatically, "It does not," and he gave his reasons why not. Without going into detail, I am satisfied that his reasons are satisfactory and quite conclusive.

The complainant charges infringement of the claims in suit by the use and sale of typewriting machines made in accordance with patent No. 573,868, dated December 29, 1896, and issued to Robert J. Fisher, except in one particular, viz., that the escapement of the patented ma- chine was changed from a simple escapement, the function of which is to control the motion of the power-driven carriage, to an escapement which had the additional function of communicating the power of the mainspring immediately after the printing took place—that is, after the key had been depressed and released—to re-engage the members of the escapement, and to restore the finger-key and type-bar to normal posi- tion. It is conceded that the result of this change was to make the machine described in the Fisher patent an infringement, where other- wise it was not. This change was made after the defendant began man- ufacturing his machine, and after Hillard had introduced his improve- ment into the Remington machine, and it had been adopted by the Rem- ington Company, and after he had granted a license to the Brooks Company, and these two companies had put the improvement into pub- lic use, and its value had been disclosed. The defendant's machine be- longs to the class of book typewriters. Perhaps the similarity of the defendant's machine with that of the patent in suit is best described by quoting from the evidence of Mr. Dorsey, one of complainant's wit- nesses. He says:

"In the machine described in the patent, in suit, as well as in defendant's machine, is found a two-part structure; one of which parts comprises a car- riage movable in respect to the other under the influence of a carriage-propel-

ling power; an escapement for controlling the speed of the carriage under the power, and comprising a rack-member and a dog-member which may be disengaged (as shown in 'Illustrative Drawings of Patent in Suit, Disengaged Position,' and in 'Sectional View of Defendant's Machine, Longitudinal Section, Disengaged Position'), and re-engaged (shown in 'Illustrative Drawing of Patent in Suit, Engaged Position,' and in 'Sectional View of Defendant's Machine, Longitudinal Section, Engaged Position'); a printing mechanism consisting of a type-bar and a type carried thereon; a key, properly connected to the printing mechanism to cause the latter to print; and a connection between the key and the dog-member of the escapement for disengaging the members of the escapement. In both machines, when the escapement is in its disengaged position, the pull of the carriage-propelling power is transmitted to the spacing-dog of the escapement and tends to force the same out of engagement with the rack-member and to restore the engagement of the detaining-dog with the rack-member, thus restoring the escapement to normal position, or, in the language of the patent in suit, 're-engaging the normally engaged dog with the rack' (lines 41, 42, page 12). As in both the defendant's machine and the machine of the patent the printing mechanism (i. e., the type-bars) is connected to the escapement through the universal bar, key-levers, and connecting wires, the movement of the escapement will be communicated to the printing mechanism which will be thus returned to normal position, in both cases the pull of the mainspring being exerted on the printing member while the latter is still at the printing point, so that the pull of the mainspring starts the type-bar back to normal position, and in both machines the spacing-dog in moving out of engagement with a tooth of the rack-member moves in a direction oblique to the direction of movement of that tooth in spacing, and in both machines it is during this movement that the carriage-propelling power acts to restore the parts. In both machines, moreover, the return of the escapement to normal position is aided by the escapement retracting spring, marked 6e in the 'Illustrative Drawing of Patent in Suit,' and as 13a in the 'Sectional View of Defendant's Machine, Longitudinal Section.' "

I think infringement is made out.

It would serve no good purpose to describe the numerous typewriters claimed to show anticipation. I have examined them all, and on the question of prior use I have carefully examined the Hammond typewriter. In no one of the selected 11 cited as anticipations do we find any reference whatever to the invention disclosed in the patent in suit. A leading expert on the part of the defendant says on this question:

"The patents I have referred to make no reference to the effect of the carriage-propelling power upon the finger-key to raise it from its lowest position; nor to the effect of said power or mainspring in re-engaging the escapement members."

The truth is that, until Hillard made his invention, and later, embodied it in the Remington machine, the value of the principle of that invention was not realized or recognized. The principle of his invention is:

"The utilization of the carriage-propelling power for the re-engagement of the members of the escapement and the return of the key and type-bar to normal position synchronously with the feed of the carriage."

Hillard discovered it, Hillard devised means for utilizing it, and Hillard, having embodied it in a machine, put it into practical operation. Quite likely it was more or less involved in many of the prior machines. I think the following cases are pertinent in this connection: Tilghman v. Proctor, 102 U. S. 711, 26 L. Ed. 279; Andrews v. Carman, 13 Blatchf. 323, Fed. Cas. No. 371; Pittsburg Reduction Co. v. Cowles, etc., Co. (C. C.) 55 Fed. 307; Chase v. Fillebrown (C. C.) 58 Fed. 377;

Clough v. Barker, 106 U. S. 175–176, 1 Sup. Ct. 188, 27 L. Ed. 134; Am. Sewage Co. v. Pawtucket, 138 Fed. 823, 71 C. C. A. 177.

In Tilghman v. Proctor, supra, the court said:

"We do not regard the accidental formation of fat acid in Perkin's steam cylinder from the tallow introduced to lubricate the piston (if the scum which rose on the water·issuing from the ejection pipe was fat acid) as of any consequence in this inquiry. What the process was by which it was generated or formed was never fully understood. Those engaged in the art of making candles, or in any other art in which fat acids are desirable, certainly never derived the least hint from this accidental phenomenon in regard to any practicable process for manufacturing such acids."

"The accidental effects produced in Daniell's water barometer and in Walther's process for purifying fats and oils preparatory to soap-making are of the same character. They revealed no process for the manufacture of fat acids. If the acids were accidentally and unwittingly produced, whilst the operators were in pursuit of other and different results, without exciting attention, and without its even being known what was done or how it had been done, it would be absurd to say that this was an anticipation of Tilghman's discovery."

In Andrews v. Carman, supra, it was said:

"A chance operation of a principle, unrecognized by any one at the time, and from which no information of its existence, and no knowledge of a method of its employment, is derived by any one, if proved to have occurred, will not be sufficient to defeat the claim of him who first discovers the principle, and, by putting it to a practical and intelligent use, first makes it available to man."

In Pittsburg Reduction Co. v. Cowles, supra, Judge Taft said:

"But, suppose it to be a fact that in De Ville's process alumina was dissolved in the bath from the anode, and that thereupon it was·electrolyzed as in the Hall process, it was a mere accident, of which De Ville made no note, and which therefore, we may reasonably infer, he did not observe. Accidents of this character cannot be relied on as anticipations of a patented process, when the operator does not recognize the means by which the accidental result is accomplished, and does not thereafter consciously and purposely adopt such means as a process for reaching the result."

I think the complainant entitled to a liberal application of the doctrine of equivalents. I find nothing either in the Patent Office records or in the patent itself that limits the claims to the precise mechanical means described in the specifications.

The result is that I hold the claims in suit valid, not anticipated, and infringed by defendant. There will be a decree for an injunction as demanded, and an accounting, with costs.