## HILLARD v. REMINGTON TYPEWRITER CO.

(Circuit Court, S. D. New York. July 24, 1908.)

PATENTS—ANTICIPATION—IMPROVEMENTS IN TYPEWRITER ESCAPEMENTS.

The Hillard patents, No. 554,874 and No. 580,281, cover related improvements in typewriters, the essential feature of each being the use of a beveled dog escapement, and are void for anticipation by a machine made by one Diss in December, 1890, which contained an escapement having every essential feature of those of the patents.

In Equity. Action for infringement of certain claims of patents numbered 554,874, dated February 18, 1896, and 580,281, dated April 6, 1897, both issued to the complainant herein and both relating to improvements in typewriting machines. Patent 580,281 was held valid and infringed in Hillard v. Fisher Book Typewriter Co. (C. C.) 151 Fed. 34, affirmed (C. C. A.) 159 Fed. 439, certiorari refused by Supreme Court February 24, 1908. No. 554,874 has never been adjudicated.

John C. Kerr and Thomas Ewing, Jr. (Thomas B. Kerr, of counsel), for complainant.

Henry D. Donnelly (William A. Redding and Wm. F. Bissing, of counsel), for defendant.

HOUGH, District Judge. Both patents in suit relate to a small but essential part of typewriter mechanism, viz.: the escapement, and the connection between them is so close that, in so far as either patent is related to defendant's alleged infringement, each reveals the other. The patent already adjudicated (580,281) may be conveniently called the "repulser" patent, and the other similarly denominated the "camming back" patent. This intimate connection between the two inventions is avowed and has been considered by the courts, and, although the repulser idea was fully disclosed in the earlier camming back application, it has been held by the Circuit Court of Appeals proper to "carve out of" the earlier application the repulser thought, and to reserve it as the subject of a subsequent patent.

The opinion of the trial court on the repulser patent sets forth with sufficient fullness the claims and specifications thereof. Although some claims alleged to be here infringed were not specifically adverted to in the Fisher Case, it seems unnecessary to again set forth the language of the patent, inasmuch as it is admitted that the substance of the repulser invention as construed in the reported case is found in defendant's alleged infringing machine, which is the well known and widely used Remington typewriter No. 6. The gist of Hillard's invention was found by the Circuit Court of Appeals to be "the employment of the mainspring which had previously been used to move the paper carriage only, to move the escapement rocker and key levers back to their

normal positions after the finger key is depressed by the stroke of the operator," and what the court believed to be new with Hilliard, and therefore entitled to protection, was "the utilization of the mainspring for the purpose described." It is by this interpretation of the repulser patent that the Remington No. 6 must be judged.

The application for the camming back patent was filed May 13, 1892, renewed November 21, 1894, and thereafter very extensively changed and amplified. Of the claims alleged to be infringed by the Remington No. 6, the following may serve as examples:

"9. In a typewriter escapement, two engaging and disengaging members, one of which can be spaced forward step by step with respect to and under control of the other, and means for spacing the first-mentioned member backward by the impact of the said other member, substantially as described.

"10. In a typewriter escapement, the combination of a rack which can be spaced forward step by step with respect to and under control of a dog, and means for spacing the rack backward by the impact of the dog, substantially as described."

Both claims were added after November, 1894.

This patent was not directly involved in the Fisher Case, but was considered by the court, which declared that the essence of the invention covered by it was the patentee's "buckle joint and the cam for camming the carriage back." The buckle joint was made just as prominent in the repulser patent as it was in the camming back patent, yet it was held by the lower court, and no exception taken to the finding by the appellate tribunal, that the joint was not of the essence of that invention, and defendant could not escape infringement by avoiding its use. The train of reasoning which in the Fisher Case eliminated the buckle joint from consideration is applicable here.

But with respect to the camming back patent, it is further urged by defendant that the original application for that patent disclosed no means of camming back the paper carriage, but only of camming back the spacing dog. So far as I am able to comprehend the vague and elusive language of the original application for the camming back patent, I believe this to be true; but it is also true that, when Hilliard filed that application in 1892, he was at pains to say that he did not limit himself to combining his "carriage retracting mechanism" with any particular let-off mechanism, etc., and, since the whole of the voluminous evidence submitted shows clearly that these inventions are really one, it does not seem to me proper to give to the camming back patent any less broad and generous interpretation than has been accorded to the repulser patent by the Circuit Court of Appeals.

It having been held therefore that the repulser patent is to be understood in a broad sense and without reference to the particular construction shown and described in the application therefor, so that the patent covers and includes any typewriter construction wherein carriage propelling power acts to return the members of the escapement and the parts connected therewith including the finger keys and type bars to their normal positions, it must be held by a parity of reasoning that the camming back patent covers and includes any typewriter construction whereby the rack and attached paper carriage can be spaced forward step by step with respect to and under control of a

dog, and spaced backward by the impact of said dog. It is, of course, obvious that varying the construction by attaching the dogs to the paper carriage while separating the rack therefrom is a mechanical equivalent not preventing infringement.

The scope of Hillard's patents having been thus fixed either by controlling decision or analogy thereto, the relation of defendant's escapement to that invention requires statement. This litigation is singular, in that there does not exist, and never has existed, any commercial machine made or sold by or for complainant and presenting his own embodiment of his own ideas. So far as the business world is concerned, these are paper patents, and counsel and witnesses alike have reasoned backward from the defendant's alleged infringing machine and pointed out therein, not imitations of anything that complainant ever made, but reproductions of ideas said to be discoverable in defendant's claims and specifications.

Following this method, it is found that the Remington machine No. 6 has what is known as a "star wheel" escapement. The teeth of this wheel successively engage with the dogs, and the motion permitted to the teeth by such successive engagements is by well-known methods passed on to the paper carriage, which is always subject to the tension of the mainspring. The star wheel is admittedly an immaterial variation from the older method of permitting the dog faces to engage directly with the rack teeth. In the position of rest a tooth of the star wheel rests on the face of the dog, which is indifferently called "stepping," "spacing," "loose," or "limber" by the witnesses. In the commercial machine the working face of the stepping dog is beveled, but mainly for purposes of clearance, and such bevel is not related to the questions discussed further than that the presence, absence, or degree thereof affects the "drop." Upon the depression of the letter key, the stepping dog is retracted or rocked toward the operator. The spoke of the star wheel in detent cannot move until the stepping dog is clear. When this occurs the wheel tooth is brought in contact with the other dog, indifferently called the "rigid" or "holding" dog. This release of the stepping dog and engagement of the wheel tooth with the rigid dog occurs before the letter key is fully depressed, and it is obvious that the length of stroke necessary for disengagement from the stepping dog and engagement with the rigid one is a matter capable of adjustment by varying the width of one dog or the other or the relation of the key lever to the rocker connected with the dogs. If the operator strike a smart or sharp blow upon the key lever, the operation of printing will be complete at or almost infinitesimally near the moment of contact between star tooth and rigid dog, for the effect of such smart blow is to "kick up" the letter carrying arm against the platen and effect printing with a slight key depression. This is true of all lever machines of the Remington type.

If, however, even after such smart blow be given, pressure on the key be continued until it is depressed to its utmost, or nearly so, the rigid dog is further retracted by the operation of the key lever on the dog rocker, and the star tooth brought into more forcible contact with the beveled face of the rigid dog, which bevel presents an inclined plane perpendicular to that of carriage movement, and at an

angle to the line of such movement of approximately 35 degrees in the Remington No. 6. This angle, however, varies widely in the models exhibited and illustrating the development of the art. The effect of this continued pressure upon the key lever, and consequent movement of the beveled rigid dog against the star tooth, is, in simple language, to force the star tooth up hill, i. e., up the inclined plane of the bevel, thereby moving the star tooth in such a direction as to force the paper carriage in a direction opposite to the pull of the mainspring. This backward movement of the paper carriage is "camming back," and it is also indicative of "repulsion," if it is not the "repulser effect" itself. That is, one effect of pressing back the paper carriage against the mainspring pull is to produce a back pressure at the letter end of the key lever, because that lever is being used to push against the mainspring pull. The result of this is that an operator too careless or inexpert to give just the proper "staccato" blow to the key lever is reminded by the back push on said lever that it is time to let go, for the operation of printing is, or ought to be, complete. In other words, the "repulser effect" is but the difficulty of lifting with a lever, against the weight of paper carriage plus the tension of the mainspring, and plus, also, the friction between the beveled face of the rigid dog and the tooth working upon it. Or, to vary the statement, the movement which is "camming back" and in this type of machine produces repulsion is but the resultant of two forces, one the finger pressure of the operator, and the other the pull of the mainspring. As soon as the finger pressure is removed, the spring of the dog rocker, assisted by "repulsion," if necessary, moves the rigid dog away from the star tooth, the stepping dog having gone forward under the influence of its own spring, engages the next tooth, the paper carriage moves forward by one space, the stepping dog is simultaneously borne back, and the parts are again in their normal position of rest.

This escapement is in every mechanical aspect identical with the escapement long used and known on the Remington No. 2 machine, with the exception of the beveled rigid dog, and this case revolves around the proposition that the use of the beveled dog in such adjustment as to produce the effects called "camming back" and "repulsion" constitute an infringement of both the patents in suit.

How completely Hillard's claims to an inventor's privileges depend upon the bevel of the rigid dog may be illustrated by a reference to the machine found to infringe in the Fisher Case (see Record on Appeal, vol. 3, Exhibits, p. 1611 et seq.), from which I think it clear that the one thing productive of the function of repulsion in the Fisher typewriter, and therefore constituting infringement according to that decision, is the beveled dog, which Judge Ray found to have been introduced into the Fisher machine after "Hillard had introduced his improvement into the Remington machine and it had been adopted by the Remington Company." 151 Fed. 44. In the light of the testimony in this case, the statement that Hillard's improvement "had been adopted by the Remington Company" is a singular one, if it be understood thereby that the Remington Company recognized and admitted the fact that they were using Hillard's invention. It was in July of 1894 that Hillard first saw a Remington No. 6, and upon examining

it "was all taken up with the escapement to the exclusion of every-thing else as soon as I saw it was provided with a beveled dog." Thus for 14 years at least the defendants have been using this device and denying that it was Hillard's invention; but Hillard's account of his first view of the escapement in suit is a perfect illustration of the central fact in this case, viz., that the beveled dog is the creator both of camming back and repulsion.

The Fisher decisions are controlling authority holding that the "re-pulser effect" is not a mere function, and, since "camming back" is produced in the Remington machine by the operation of the same ele-ments in the same way, it must follow that "camming back" also is not a function; but it equally follows that, if the beveled dog which, in the use presented, produces these two "inventions" (as complainant's brief calls them), was put to the same use and made productive of the same results by some one other than Hillard, and before he did so, Hillard is not the first inventor. But before taking up the ques-tion of priority, the utility of camming and repulsion may be con-sidered. If these two qualities could be separated in the Remington machine, it would I think be proper to disregard wholly the camming back patent as suggesting nothing useful.

It is plain that camming does occur in this machine upon the slow full stroke of the key lever and correspondingly ample movement of the rack or dog rocker. It is equally plain that such camming does not and cannot begin until the movement of dog or rack has progressed so far as to compel retraction of the paper carriage as a resultant of the finger force at the lever end and the spring tension on the car-riage; but observation of the numerous models submitted is convincing that, with a machine so mechanically adjusted as to deserve commer-cial success, camming back does not occur in useful service; not be-cause it cannot, but because it ought not, for, by the stroke of any operator worthy of employment, printing is finished and the carriage ready for final acceleration by one letter space before the parts con-taining the necessary bevel are in a position to cam. If the key pres-sure be unnecessarily continued and camming thereby produced, it is clear that the paper carriage must during the time of one stroke, which prints one letter in one letter space (i. e., one-tenth of an inch), be started, retarded, stopped, backed, and again started during the time required to make one letter of the 30 to 50 words a minute to be ex-pected from a very moderate performer. Camming back may, and I think does, assist in preventing learners from blurring on the Rem-ington form of machine; but a workman who cams back the paper carriage is unfit for his work, and I believe with counsel for defend-ant that camming back does not occur with the "printing stroke"—that is, a stroke which prints anything worth having

That the repulser effect is useful is not denied; but I think it more accurate to say that what is useful and desirable is the short, quick stroke, the "staccato" blow so often mentioned in the evidence. Re-pulsion does not create this, for short, quick blows can be just as well given to machines without the beveled dog and incapable of re-pulsion, e. g., the Remington No. 2; but repulsion does assist the operator in limiting the length of the stroke given, by rendering it

more difficult to prolong the stroke unnecessarily. There is much testimony repeated in this case from the Fisher Case, but there not denied, regarding the painful difficulty of operating machines without repulsion and the deformities resulting to the hands of women working much with the nonrepulsive machine. I think this testimony is grossly exaggerated, if not wholly untrue, and is entirely met by the testimony introduced for the defendant herein, and it neither advances nor commends the complainant's case with any one accustomed to the commercial use of typewriters from the time of their general introduction. By admission of utility in the repulser effect at least, and prior holdings of novelty and invention in complainant's use of the mainspring to assist in producing repulsion and camming, this litigation narrows to the issue of priority, on which defenses are urged not advanced in the Fisher litigation.

I do not think it useful to elaborately digest the testimony on this point. Much acrimony has been displayed by some of the witnesses, and accusations of bad faith too freely made. In May, 1894, Hillard affixed a beveled dog escapement on a Remington machine and left it for examination at defendant's office. In the following July he saw a Remington No. 6 substantially identical with the one produced on this hearing, and he has doubtless ever since believed that the defendant stole his escapement. I believe the truth to be, however unfortunate for Hillard, that he was reducing his ideas to practice at the same time that similar ideas were being embodied in the new type of machine then about to be put forth by defendant. It is proved that beveled dogs substantially identical with those of which Hillard complains had been put on the Remington No. 6 certainly in April, 1894, and probably in March, 1894, and had been publicly sold. The alleged theft was impossible.

The original application for the camming back patent, which, as previously noted, revealed both thoughts of Hillard's, was filed in May, 1892. In December, 1890, one Diss, a mechanic in the Ilion factory of defendant's predecessors, made, operated, and exhibited to other persons skillful in mechanics, a Remington machine of the No. 5 or swinging rack type, which he sent to defendant's New York office for testing and approval. The escapement of this machine is in every essential mechanical feature identical with that of the No. 6 alleged to infringe. The most strenuous efforts have been made to show that this is a made-up machine, and that it could not have existed in its present shape in December, 1890. It is sufficient to say that in my judgment these efforts have failed, and that this so-called Diss machine, if first made now, would be an infringement of the patents in suit as construed by the Fisher Cases, and as made in December, 1890, is a complete anticipation thereof, so far as the claims here in suit are concerned.

Nor is Diss's machine either an abandoned experiment or something made without thought of the improvements real or fancied now found in it. It is true that the entire machine, for reasons which had nothing to do with the escapement, did not meet with approval; but the beveled dog did meet with a limited approval and a persistent though limited sale through the Boston agency of defendant's pred-

ecessors, down to the time that the No. 6 Remington became the leading product of defendant company, and, unless the testimony of several intelligent and unimpeached witnesses is to be wholly disbelieved and regarded as willfully dishonest, the results now called "repulsion" and "camming back" were observed, understood, and commented upon—"repulsion" with favor, and "camming back" with disfavor. It is true that the prime object of the beveled dog escapement manufactured by Diss in 1890 was speed, but that also was Hillard's purpose throughout the whole of his experiments, for, as he said to his sister in 1891, the object of his invention was "to make a springy action and to make the machine write fast."

Complainant seeks to break the force of the Diss anticipation by presenting as the first embodiment of the inventions in suit a beveled rack which he made and applied to a Remington No. 2 in the autumn of 1890. The history of this rack is singular, and the corroborative evidence regarding the time of its construction and the results said to have been obtained from or observed in it by Hillard extremely weak. It is, however, my opinion from repeated readings of Hillard's testimony in this and the Fisher Case, and observation of him through a protracted argument, that he is an honest, though somewhat fanatical, man. I believe he did make this rack, but do not think that it can be regarded as an embodiment of the patent claims now in litigation. Hillard himself has deposed that it is not "the beveled dog alone that solves the problem," and it is equally true that a beveled rack alone does not do so. There is no evidence presented persuasive of the vital finding that not only did Hillard make this rack and use it and experiment with it, but that he in the fall of 1890 adjusted it or operated it in connection with other elements so as to produce the results for which he has had one patent upheld.

If there ever was an abandoned experiment, Hillard's beveled rack of 1890 seems to be one. He dismantled it, put it away in a box, continued his experiments, and in September, 1891, declared in writing:

"My invention consists in a dog for typewriters. My invention was perfected and placed on the Remington typewriter, and I wrote with it at 4 a. m. September 2d, having spent the night making the dog."

In the face of this declaration, I do not see how he can now advance the rack of the previous year as an embodiment of the inventions in suit, although it is true that, upon close investigation of the machine which has recently received that rack, both "camming back" and "repulsion" can be observed as occurring in a somewhat feeble manner.

When the complainant was engaged in an interference with Cash (the patentee so much referred to in the Fisher suit), he did not mention his 1890 rack. It is now said that it was not necessary to mention it in that proceeding, because Cash carried his thoughts back to 1886; but it remains true that, when testifying in that interference, Hillard purported to tell the whole story of his experiments with typewriter escapements, and he likewise began with 1886, but made no mention of the rack of 1890. The conclusion is irresistible that he himself has first thought of that rack as an embodiment of his cherished ideas, under the exigencies of this litigation, and of the dangerous anticipation by Diss first shown in this case.

It is finally urged by complainant that, however important is the beveled rigid dog, the marrow of his contention is, not that he was the first to produce a beveled dog escapement, but that he was the first to devise one having certain characteristics. The only characteristics to which he can refer are "repulsion" and "camming back." His expert declares, pursuing this line of thought, that "the great value of the repulser effect of the mainspring is due to the time that it operates, namely, about the instant of printing," and it is further asserted that "the beveled dog alone is not the agent of camming back and repulsion; that dog must be arranged and co-related with other parts in the escapement in a certain way to produce those results." This is as much as to say that the machine capable of camming back and repulsion must be properly adjusted and mechanically arranged in order to operate. So must any other machine. It is possible in any form of machine produced, of the Remington type, to change the adjustment and co-relation of the parts so as to make it inoperative. The stroke can be entirely altered by tightening or loosening the universal bar, and the rack and dogs can be so arranged as to prevent the rack teeth or wheel teeth from striking the bevel at all; but it has never been decided that either of these patents protect a certain adjustment of mechanical parts or a function or result obtained from such adjustment.

The final question seems to me whether the machine made by Diss in 1890, as he made and designed it, used and exhibited it, did produce the same results in the same way as does the Remington No. 6. I think it did, and that the reasons why it did so were completely understood by several persons who saw and examined it and would have been capable of reproducing it had occasion arisen. Complainant's own statement of his position on this point is instructive. He declares that in May, 1894, he had and left at one of defendant's offices—

"a Remington typewriter equipped with a single feed beveled dog escapement which solved the problem. That was my invention. My escapement on that machine was arranged to start the carriage feed prior to the printing and with a slow blow to push it back again. Thus, while my escapement releases the carriage to move its feed prior to the printing, thus adapting it to the requirements of speedy operators, it held the carriage under control at the instant of printing, and it therefore differed fundamentally from the beveled dog escapements described by defendant prior to May, 1894, as well as from the beveled dog escapements"

—sold and used by defendants in New England and above referred to. And his counsel claim that:

"Defendant's escapements released the carriage to perform an uncontrolled part of its feeding movement during the depression of the key."

This is the essence of complainant's case as put by himself. He cannot deny that there were beveled dogs before 1894, and I believe he entertains honest doubts whether there were not beveled dogs before he thought them out; but the fundamental difference as late as 1894 between his beveled dog and all others was that he did not release the carriage (as did other mechanics) to perform "an uncontrolled portion of its feeding movement during the depression of the key." This reduces his contention to the meaning of the word "uncontrolled." If

by "uncontrolled" is meant the ability of the paper carriage to travel a certain distance under the influence of the mainspring tension before it encounters any stoppage or resistance to that motion, every escapement except one wherein the faces of the two dogs are wholly in the same plane in the normal position of rest releases the paper carriage for an uncontrolled feed instantly, i. e., on the down stroke of the key lever. If the faces of the two dogs are not in the same plane, there will be a "drop," and such drop is uncontrolled while it lasts. If the face of the rigid dog is beveled, the carriage will travel uncontrolled until the rack tooth strikes the bevel. It is entirely possible to conceive of an escapement which holds the carriage under control at all times; but the beveled dog escapement does not do so, and cannot do so, if the bevel is used at all. It would be possible to adjust the machine so that the rack tooth passed from the plane face of one dog to the plane face of the other, not touching the bevel; but such an adjustment would deprive the bevel of all use. Nor does the use of the phrase "single feed" advance the discussion. It is admitted that this name was invented for the purposes of this case. It is apparently used in contradistinction to "divided feed"; but the divided feed escapement is a well-known and old device not involving the use of beveled dogs at all and depending entirely upon the adjustment of the drop. Hillard's device of 1894 as reproduced by himself is no more a "single feed escapement" (whatever that means), than is any other beveled dog escapement wherein the bevel is used to produce speed and incidentally and necessarily repulsion, and may also produce camming back, in the hands of an operator who does not understand his business.

The bill is dismissed.